**UNITED STATES of America,**
**Plaintiff,**

v.

**Pauline LIN, FU–TSUN Lin, Susan Lo, Ming Gardens Chinese Restaurant, Inc. August Moon Chinese Restaurant, Lin & Lo, Inc., Defendants.**

**No. CRIM 00–170.**

United States District Court,
E.D. Kentucky,
Lexington Division.

April 16, 2001.

---

David Marye, U.S. Attorney's Office, EDKY, Lexington, KY, for U.S. Attorneys.

Dennis M. Clare, Law Offices of Dennis M. Clare, Louisville, KY, for Pauline S. Lin, Ming Garden Chinese Restaurant, Inc., August Moon Chinese Restaurant, Inc., defendants.

Dennis M. Clare, Law Offices of Dennis M. Clare, Louisville, KY, Patrick J. Renn, Law Offices of Patrick J. Renn, Louisville, KY, for FU–TSUN Lin, defendant.

David J. Guarnieri, Johnson, Judy, True & Guarnieri, Frankfort, KY, for Chokiang Saengo, defendant.

Eugene Goss, Goss & Goss, Harlan, KY, for Johnny Wang, defendant.

Fred E. Peters, Lexington, KY, David M. Coorssen, Smith & Helman, Louisville, KY, for Jose Carreon, defendant.

Steven Rush Romines, Romines, Weis & Young, Louisville, KY, for Susan Lo, Lin & Lo, Inc., defendants.

Ronald Cook, Smith & Helman, Louisville, KY, for Roy Yulizar, defendant.

### OPINION & ORDER

FORESTER, Chief Judge.

This matter is before the Court on the motion of defendant Susan Lo to dismiss indictment based on denial of defendant's right of confrontation guaranteed by the Sixth Amendment [DE# 195]. All other defendants joined in this motion either by written or oral motion and the Court granted these motions to join at the hearing held March 7, 2001.

On March 13, 2001, this Court granted the defendants' motion without discussion. This opinion is filed pursuant to that order.

## I. FACTUAL BACKGROUND

The facts relating to this motion are undisputed. Officials from the Immigration and Naturalization Service ("INS") apprehended several persons who were illegally employed at the Ming Gardens restaurant located in Lexington, Kentucky,

the August Moon restaurant in Lexington, Kentucky, and the Ming Gardens restaurant in Florence, Kentucky. These raids occurred on or about August 26, 2000, September 13, 2000, and November 8, 2000. At the time, the INS interviewed and obtained sworn statements from the illegal workers. Each worker was then, at the Government's discretion, either (1) deported; (2) offered voluntary departure;[1] or (3) detained as a material witness.

The defendants were subsequently indicted in a 71–count indictment filed on December 7, 2000. The Court entered its General Order of Discovery on December 15, 2000, in which it discussed, in detail, the Government's obligation to produce to the defendants material pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (hereinafter *"Brady* material"). That same day, the Government moved for leave to depose the material witnesses. At a hearing held on December 22, 2000, the Court granted the Government's motion and ordered that the material witnesses be released to the INS upon completion of their depositions. The Court also granted a defense motion to compel production of any sworn statements of the material witnesses (the "Material Witness Statements") prior to their depositions. It appears from the record that the depositions of approximately 18 material witnesses commenced on or about January 17, 2001.

On February 20, 2001, the Court held a hearing on all pending motions, including several discovery motions filed by the defendants. While the Material Witness Statements had been provided to the de-

fense pursuant to the Court's earlier order, the defendants claimed that the sworn statements of the illegal aliens who were deported or offered voluntary departure (the "Deported Witness Statements") had not been made available to them.[2] In response to the Court's inquiry as to whether all *Brady* material had been furnished to the defendants, the Government stated that there may have been some additional sworn statements that it needed to produce (i.e., the Deported Witness Statements), but that it was still considering whether to produce them. Defense counsel asserted that they were entitled to the statements of *all* of the workers interviewed after the raids, and the Government then said that it would provide all statements, including the Deported Witness Statements, to the defendants. The Government then mailed the statements to the defendants within one week of the hearing.

In sum, the Deported Witness Statements were not provided to the defendants until after the defendants raised the issue with the Court. Further, all but a few of the depositions of the material witnesses had taken place prior to the Government's disclosure of the Deported Witness Statements.[3] This motion followed.

## II. MOTION TO DISMISS

In their motion, the defendants argue that the indictment should be dismissed based on the Government's denial of their Sixth Amendment right of confrontation and their Fifth Amendment right to due process because the Deported Witness

---

**1.** For purposes of this case, "voluntary departure" is the equivalent of deportation by the Government. *United States v. McLernon,* 746 F.2d 1098, 1121 (6th Cir.1984).

**2.** From some of the statements made at that hearing, the Court questions whether the de-

fendants even knew of the existence of these statements as of February 20, 2001.

**3.** It appears from a review of the record that depositions of the material witnesses continued through March 6, 2001.

Statements reveal that these witnesses likely would have provided favorable, material, and exculpatory testimony in support of the defendants. Specifically, the defendants argue that the witnesses' responses to questions indicate that the defendants had no knowledge or otherwise did not know that their workers were illegal aliens. These witnesses also stated that the defendants had required them to provide documentation and that the witnesses had purchased fraudulent documents elsewhere. In sum, the defendants argue that the Government detained witnesses it deemed favorable to its case and deported any witnesses who would testify favorably for the defense. They primarily rely on *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), *United States v. Armijo–Martinez*, 669 F.2d 1131 (6th Cir. 1982), and *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984), in support of their position.

The Government responds that these cases are distinguishable and do not require dismissal in the present case. It also argues that none of the testimony in the Deported Witness Statements is material to the indictment because none of these witnesses were eyewitnesses to the discrete crimes charged.

## III. ANALYSIS

Pursuant to the Sixth Amendment to the United States Constitution, a defendant has a right "to have compulsory process for obtaining witnesses in his favor ...." U.S. Const. amend. VI. This does not grant a defendant an unfettered right to secure the attendance of any witness, only witnesses "in his favor." *Id.* The United States Supreme Court has determined that a violation of this right occurs when a defendant is arbitrarily deprived of putting on the stand a witness "whose testimony would have been material and relevant to the defense." *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

The most recent case from the United States Supreme Court addressing the right to compulsory process in the particular context of the instant case is *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In *Valenzuela–Bernal*, the defendant entered the United States illegally from Mexico and "paid" his smugglers by agreeing to drive himself and five other passengers to Los Angeles. As the vehicle approached a Boarder Patrol checkpoint, one of the agents noticed the passengers lying down in the back of the vehicle and motioned for the defendant to stop. In response, the defendant accelerated through the checkpoint, led authorities on a high-speed chase, eventually stopped, and fled on foot along with the passengers. The defendant and three of the passengers were eventually apprehended. *Id.* at 860–61, 102 S.Ct. 3440.

Investigators subsequently interviewed the defendant and the three passengers. All of them admitted to being in the United States illegally. An Assistant United States Attorney determined that the passengers did not have any material or relevant information and deported two of them, detaining the third as a material witness. *Id.* at 861, 102 S.Ct. 3440.

The defendant was charged pursuant to 8 U.S.C. § 1324(a)(2) with knowingly transporting an illegal alien who had last entered the country within the preceding three years. He was convicted after a bench trial, but the Ninth Circuit reversed holding that the Government violates the Fifth and Sixth Amendments when it deports alien witnesses before defense counsel has an opportunity to interview them. In making this determination, the Ninth

Circuit applied the "conceivable benefit" test, whereby a violation occurs whenever a deported witness' testimony could conceivably benefit a defendant, and held that this test is met whenever a deported witness was an eyewitness to the crime charged. It did not make a difference that the defendant had failed to explain how the deported alien could help him prove that he had no knowledge that his passengers were in the United States illegally. *Id.* at 862–63, 102 S.Ct. 3440.

The Supreme Court reversed, first noting the two important, but conflicting, duties of the Executive Branch implicated in this context.

> One of the duties of the Executive Branch, and a vitally important one, is that of apprehending and obtaining the conviction of those who have violated criminal statutes of the United States. The prosecution of respondent is of course one example of the Executive's effort to discharge that responsibility.
>
> But the Government is charged with a dual responsibility when confronted with incidents such as that which resulted in the apprehension of respondent. One or more of the persons in the car may have violated the criminal laws enacted by Congress; but some or all of the persons in the car may also be subject to deportation as provided by Congress. The Government may, therefore, find itself confronted with the obligation of prosecuting persons in the position of respondent on criminal charges, and at the same time obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted.

*Id.* at 863–64, 102 S.Ct. 3440. The Court then noted that the prompt deportation of aliens served several purposes—it was "the most effective method for curbing the enormous flow of illegal aliens across our southern border" and also satisfied several practical considerations raised by detaining unnecessary witnesses in already-overcrowded federal facilities. In particular, "the detention of alien eyewitnesses imposes substantial financial and physical burdens upon the Government, not to mention the human cost to potential witnesses who are incarcerated though charged with no crime." *Id.* at 865, 102 S.Ct. 3440.

Given this dilemma faced by the Government, the Court rejected the "conceivable benefit" test adopted by the Ninth Circuit,[4] noting that it required "little if any showing on the part of the accused defendant that the testimony of the absent witness would have been either favorable or material." *Id.* at 866, 102 S.Ct. 3440. Citing *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), and relying on a number of cases "in the area of constitutionally guaranteed access to evidence," the Court held that a defendant "cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of [alien witnesses] deprived him of their testimony. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Valenzuela–Bernal,* 458 U.S. at 866, 102 S.Ct. 3440.

The Court recognized the difficult task facing a defendant whose counsel did not have an opportunity to interview deported witnesses in order to determine what favorable information they may possess.

---

4. The Supreme Court also noted that several other courts including the Sixth Circuit had adopted "slight variations" of the Ninth Circuit test, citing *United States v. Armijo–Mar-* tinez, 669 F.2d 1131 (6th Cir.1982). *Valenzuela–Bernal,* 458 U.S. at 860 n. 2, 102 S.Ct. 3440.

However, the Court noted that "this may well support a relaxation of the specificity required in showing materiality ...." *Id.* at 870, 102 S.Ct. 3440. Citing *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Court also noted that

> [i]n such circumstances it is of course not possible to make any avowal of *how* a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality.

*Id.* at 871, 77 S.Ct. 623. The Court also stated that "the defendant cannot be expected to render a detailed description of [the witness'] lost testimony." *Id.* at 873, 77 S.Ct. 623. Because the defendant in *Valenzuela–Bernal* made no effort to provide "some plausible explanation" as to how he would have been assisted by the deported alien witnesses' testimony, the Court reversed. *Id.* at 871, 874, 102 S.Ct. 3440.

In summarizing the holding, the Supreme Court noted that deportation is justified "upon the Executive's good-faith determination that [the alien witnesses] possess no evidence favorable to the defendant in a criminal prosecution." *Id.* at 872, 102 S.Ct. 3440. The mere fact of deportation—alone—is not sufficient to establish a violation. *Id.* at 872–73, 102 S.Ct. 3440.

The defendants in this case also rely on the Sixth Circuit's opinion in *United States v. Armijo–Martinez*, 669 F.2d 1131 (6th Cir.1982), cited by the Supreme Court in *Valenzuela–Bernal* as taking a position similar to the rejected Ninth Circuit "conceivable benefit" test. In *Armijo–Martinez*, the defendants were charged with transporting illegal aliens. When arrested, one of the defendants was driving a van with thirteen illegal alien passengers and the other defendant was found with five illegal alien passengers. The next day, the INS filed a complaint against the defendants listing two passengers from each van as material witnesses. These four material witnesses were detained and held on bond for almost two weeks in the case of one, and 43 days in the case of the other three. The remaining 14 witnesses were offered voluntary departure approximately two days after their arrest. *Id.* at 1132–33.

The indictment charged the defendants with illegally transporting both the material witnesses and the deported aliens. In moving to dismiss the indictment, the defendants argued that they believed that all of the passengers were legal and that at least some of them had shown one of the defendants documentation, supporting his claim of lack of knowledge. Applying the Ninth Circuit's "conceivable benefit" test, the district court dismissed the indictments and the Government appealed. On appeal, the Sixth Circuit affirmed the district court's determination that the defendants had made a sufficient showing of prejudice. While not adopting the "conceivable benefit" test outright, it essentially applied the same standards, citing a "very low threshold" for showing prejudice. *Id.* at 1139. The Government appealed and the Supreme Court granted the petition for writ of certiorari, vacated the judgment, and remanded the case for further consideration in light of *Valenzuela–Bernal*. *United States v. Armijo–Martinez*, 459 U.S. 810, 103 S.Ct. 34, 74 L.Ed.2d 47 (1982). The Sixth Circuit did not publish its opinion reconsidering the case.

The defendants also rely on the Sixth Circuit's decision in *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984), which was decided after *Valenzuela–Ber-*

*nal.* In *McLernon,* several defendants were convicted in relation to various cocaine transactions conducted with undercover agents. On appeal, one of the defendants argued that his indictment should be dismissed because the Government facilitated the departure of a witness who would have corroborated his claim that he had traveled on a commercial flight on legitimate business just prior to the drug transaction at issue, not on a private plane to facilitate the drug transaction as alleged by a co-defendant. The Sixth Circuit held that the record was inadequate and remanded for a hearing to determine whether the testimony would have been "material and favorable" and whether defense counsel had the opportunity to interview the witness before deportation. *Id.* at 1121–22.

■ With this authority in mind, the Court turns to the case at bar. There is no question in this case that the Government facilitated the departure of the witnesses at issue. There is also no question that the defendants and their counsel were deprived of the opportunity—by the Government alone—to interview the witnesses prior to their departure in order to determine precisely what favorable evidence they might have to offer. The only question in this case, then, is whether their testimony would have been material and favorable to the defendants. In making this determination, the Court keeps in mind the Supreme Court's observations that the witnesses' unavailability—through no fault of the defendants—"may well support a relaxation of the specificity required in showing materiality" and the defendants in this situation "cannot be expected to render a detailed description of their lost testimony." *Valenzuela–Bernal,* 458 U.S. at 870, 873, 102 S.Ct. 3440.

In this case, it is impossible for the defendants to make an avowal as to the deported aliens' testimony because they were denied any opportunity to interview them before the Government rendered them unavailable. However, the Deported Witness Statements reveal that several of these witnesses would have testified that proper documentation *was* required to work for the defendants and that they had purchased fraudulent documents from persons other than the defendants. Therefore, these witnesses had information relating directly to the defendants' knowledge of whether their workers were illegal.

For example, in the sworn statement of Alberto Giral–Manuelas, he stated that defendant Susan Lo had asked him if he had papers documenting that he was permitted to work in the United States and he told her that he did and showed her a fabricated Social Security card he had purchased from a man in Houston, Texas. Jose Baltazar–Pena, Cirila Cruz–Morales, and Julian Lorenzo Baltazar stated that they had purchased fabricated documents in North Carolina. Baldomero Attamirano Garcia–Mendoza stated that Pauline Lin had asked him for documentation and he told her that he had lost it. Others stated that the person who hired them did not know that they were not legally permitted to work in the United States. *See* Stmt. of Bartolo Jiminez–Hernandez at pp. 3–4; Stmt. of Ferry Firman Subaya at p. 3; Stmt of Fortino Garcia–Mendoza at p. 3.

Also, because of the Government's unilateral actions in deporting these witnesses, it has made it impossible to know what additional information they may have provided in support of the defense. The limited post-arrest questioning by the Government was obviously not designed to elicit this type of information—only to elicit information favorable to the prosecution. Further, it is reasonable to infer that some of these early deportees were friends with

or at least acquaintances of the material witnesses who were detained and may have been present during relevant discussions. These deportees may have in fact lived with the material witnesses and, in addition to having information that would be favorable to the defense, are perhaps the *only* witnesses who may have information the defense could use to impeach the material witnesses' testimony. Under these facts, the Court cannot find that there was a good faith determination by the Government that these witnesses possessed no evidence favorable to the defendants in this prosecution.

The timing of the Government's production of the Deported Witness Statements is also of great concern to the Court. The defendants were not provided these statements until after they raised the issue with the Court at the hearing on February 20, 2001. By the time the statements were furnished, a majority of the material witness depositions had already been taken and those witnesses were also out of the reach of the defendants. Unlike the *Armijo–Martinez* case, where the witnesses were deported after the criminal complaint was filed, in this case the defendants never had a chance to interview the witnesses, as they were apparently deported before the defendants were aware of their existence. Also, the fact that at the February 20th hearing the Government was still determining whether to produce or withhold the Deported Witness Statements implies that the Government may have considered them *Brady* material.

Further, it appears that at least some of these witnesses were not deported for up to six weeks after their interview, which would mean that at least some of these witnesses were detained just up to the point of indictment and *then* deported. This is in contrast to Congress' policy of promptly deporting illegal aliens and rais-es the specter that there may have been an intentional act by the Government to deny the defendants the opportunity to interview these witnesses. Based upon the above, the Court finds that the defendants have made a plausible showing under *Valenzuela–Bernal* that the deported witnesses would have provided material and favorable testimony on the issue of the defendants' knowledge as to whether they or other workers were illegal. The Court further finds that the defendants were prejudiced by the deportation of these witnesses and the only appropriate remedy is dismissal of the indictment.

The Government argues that these deportees were not eyewitnesses to the crimes charged in the indictment and, therefore, the cases relied on by the defendants are distinguishable. However, there is no support in the record for this assertion and the Government cannot say this with any degree of certainty. The post-arrest questioning certainly would not have elicited this information. Also, because these witnesses are now no longer available, there is no way to know whether they were eyewitnesses to any of the crimes charged. In two of the cases relied on by the defendants, *Valenzuela–Bernal* and *Armijo–Martinez,* because the charges were limited to transporting illegal aliens, it was questionable how the aliens who were deported could have helped the defense in those cases. In this case, on the other hand, the charges are much more extensive and overlapping. The witnesses were employed by the defendants, one for as long as five years, and some likely lived with the material witnesses. Given this, it is much more likely that these witnesses would have impeaching information or would have been eyewitnesses to some relevant events, in addition to providing material and favorable evidence regarding the defendants' knowledge.

## IV. CONCLUSION

Based on the foregoing, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that

(1) the defendants' motion to dismiss indictment based on denial of defendant's right of confrontation guaranteed by the Sixth Amendment [DE# 195] is GRANTED; and

(2) judgment in favor of the defendants will be entered contemporaneously with this opinion and order.