UNITED STATES of America,
Plaintiff,

v.

NEBRASKA BEEF, LTD., and, Nebraska Beef, Inc., together d/b/a Nebraska Beef, Kim V. Nguyen, Mario Villarreal–Carrillo a/k/a Mario Villarreal–Carlos, Tony N. Joy, Julian Martinez, Jose de Jesus Quezada–Neri, a/k/a/ Jesus Quezada, Angelica Quezada, a/k/a/ Angelica Rosales, and, Dionicio Labra, Defendants.

No. 4:00CR355.

United States District Court,
D. Nebraska.

April 8, 2002.

Alan Everett, Assistant United States Attorney, Lincoln, NE, for plaintiff.

Mark A. Weber, Walentine, O'Toole Law Firm, Emil M. Fabian, III, Fabian, Thielan Law Firm, Mary C. Gryva, Frank, Gryva Law Firm, William M. Lamson, Jr., Robert A. Mooney, Brian J. Brislen, Lamson, Dugan LLP, Michael A. Nelsen, Hill-

man, Forman Law Firm, Steven E. Achelpohl, Omaha, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This disturbing case presents an important question. When the government removed hundreds of illegal aliens from this country before their testimony could be preserved, did the government act in bad faith and deny the defendants material and favorable evidence? On April 5, 2002, concluding that the answer was "yes," I announced that I would dismiss the indictment as to certain of the defendants.

While a "very close question," Magistrate Judge Jaudzemis recommended that I deny six defendants'[1] motions to dismiss due to loss of testimonial evidence. (Filing 175 at 21.) Although concluding the government acted in bad faith, the judge believed that the illegal aliens who were removed from this country could not have provided "material" testimony to the defense. On the other hand, because of its bad-faith conduct, Judge Jaudzemis entered an order precluding the government from using at trial any evidence regarding the hundreds of illegal aliens who were removed from this country. (*Id.*)

The government has appealed the order that bars it from using documents and testimony regarding the sweep which took place on December 5, 2000, and which resulted in the apprehension, interrogation and removal of hundreds of illegal aliens.[2] Conversely, the moving defendants object-

ed to the report and recommendation. That is, they contended that I should grant the motions to dismiss the superseding indictment because the government acted in bad faith and because the illegal aliens could have provided material and favorable evidence to their defense.

After de novo review, I agreed with the defendants. The government acted in bad faith when it detained and then deported or otherwise removed a great number of illegal aliens before their testimony could be preserved. In so doing, it deprived the moving defendants of material and favorable evidence.

## I. BACKGROUND

After three days of sometimes contradictory testimony from law enforcement agents, continuances to allow the Immigration and Naturalization Service (INS) to find documents, many confusing exhibits and a lot of briefs, Judge Jaudzemis has done a remarkable job of making sense of the facts. (Filing 175 at 3–12.) For the most part, neither the government nor the moving defendants contest the judge's factual summary. In addition to Judge Jaudzemis' factual summary which I adopt, the following are the facts which I find to be especially important.

### A.

In the second superseding indictment (filing 85), the government alleges that the entities, Nebraska Beef, Ltd., and Nebras-

---

1. The motions were made by Nebraska Beef, Ltd., Nebraska Beef, Inc., Mr. Nguyen, Mr. Villarreal–Carrillo, Mr. Joy and Mr. Martinez. I sometimes refer to these defendants as the "moving defendants."

2. Parenthetically, even if Judge Jaudzemis had not precluded the government from using the evidence because of its bad faith, the government would have had a difficult time getting around a hearsay objection at trial if it

tried to use the statements of the aliens to further the prosecution. *See United States v. Pena–Gutierrez*, 222 F.3d 1080, 1086–87 (9th Cir.) (in an alien smuggling case, report prepared by INS inspector of statements of deported alien did not fall within the exception to hearsay for public records as it was prepared in an adversarial setting during a criminal interrogation), *cert. denied,* 531 U.S. 1057, 121 S.Ct. 670, 148 L.Ed.2d 570 (2000).

ka Beef, Inc., (collectively Nebraska Beef), conspired with their employees, Nguyen, Villarreal–Carrillo, Joy and Martinez, to commit and cover up immigration violations during the hiring of aliens who work in their packing house. (Count 1.) The conspiracy is premised upon the general conspiracy statute found at 18 U.S.C. § 371.

The indictment alleged that from July 31, 2000, "through on or about December 5, 2000," the defendants "willfully, and knowingly" conspired to commit various offenses including hiring illegal aliens, providing false immigration documents, completing false immigration forms, and representing to the Nebraska Department of Labor that false social security numbers provided by aliens were genuine. Then, six overt acts are alleged on various dates. The conduct of two confidential informants and an undercover INS agent prior to December 5, 2000, provides the factual basis for the overt acts.

As to each of the moving defendants, the superseding indictment then alleges various substantive counts in furtherance of the conspiracy. (Counts 2–10.) The conduct of two confidential informants and an undercover INS agent prior to December 5, 2000, provides the factual basis for significant portions of all the substantive counts. Counts 11 through 13 allege a conspiracy and various substantive counts against non-moving defendants who have not been apprehended or who have fled. Those counts involved Jose De Jesus Quezada–Neri, Angelica Quezada and Dionicio Labra. In general, those charges allege that in El Paso, Texas, and elsewhere the non-moving defendants recruited illegal aliens to work at Nebraska Beef, transported them to Omaha via bus and supplied them with false papers. Finally, the

government asserts a forfeiture count against Nebraska Beef. (Count 14.)

The original charges were presented by a criminal complaint filed under seal on November 30, 2000. (Filing 1.) Using a hundred or more agents, on December 5, 2000, the INS executed search warrants and conducted a raid at Nebraska Beef.[3] Everyone agrees that the raid was conducted to obtain evidence to further this prosecution. In that regard, the raid was different than a typical INS enforcement sweep where a specific criminal investigation is not the focus of the foray.

Prior to the raid, a special briefing was held. While INS agents were present at the briefing, no government lawyers were present. Regarding the pending charges, the agents were told that if they found illegal aliens, they were to interview them. The agents were told to "go into great depth" and look for and preserve both inculpatory and exculpatory information provided by any illegal aliens who might be found. (Filing 165 at 42:8–18 ("[W]e were told to go into great depth ..., and we were to look for things that both would support ... our case but also anything exculpatory.").) The agents were told to record information on a certain form ("I–213") and the agents were told to report potentially inculpatory or exculpatory information to supervising agents. (Filing 165 at 43:11–45:6.) It is further undisputed that the general practice of the INS was not to remove anyone who was considered a material witness for the defense. (Filing 165 at 57:10–21 ("[A]bsolutely, we would" keep anyone possessing "exculpatory evidence" as "a material witness."))

The I–213 form was amended to require the agents to tailor their interviews to this case. For example, the form had extra

3. Nine days later the government filed its first indictment (filing 22), in effect "superseding" the sealed complaint filed on November 30, 2000.

lines that required the agent to ask: who hired the alien; who recruited the alien; how the alien traveled to Omaha; who assisted in completing the I–9 form; from whom the alien received his or her documents; and how much the alien paid for the documents. (Ex. C to Ex. 19.)

Sure enough, on December 5, 2000, the INS found and detained over 200 illegal aliens at Nebraska Beef.[4] The precise number of aliens who were detained is unclear because the government's records are so poor. The number is probably between 209 and 213 people.

Apparently because it was costing the government over $11,000 per day to hold the aliens, on December 6 and December 7, 2000, approximately 152 aliens were removed from the United States.[5] Nineteen other aliens were held in custody and sent to Dallas to appear before immigration judges. Others were released on their own recognizance. The INS estimates that 30 people were released on their own recognizance. (Ex. 19.) Of those released on their own recognizance, at least 11 are now fugitives. Ultimately, the INS admits that at least 181 aliens were either deported or were "voluntarily returned." (Ex. 19.) The whereabouts of the others is unknown to the INS.

Aside from knowing that the great majority of the illegal aliens were quickly removed from this country, no one from the INS knows for sure precisely how many were removed from this county or how many were released on their own recognizance in this country. Since the government admittedly seized all of them,

deported most of them and does not now know where any of them are, Judge Jaudzemis found, and I agree, that all the illegal aliens seized at Nebraska Beef on December 5, 2000, whether the number was 209 or 213, are unavailable to the defendants.

It is undisputed that defense counsel were not given an opportunity to interview any of the illegal aliens before they were removed from this country. In fact, most of the aliens were removed from this country on December 6 and 7, 2000, the same dates when the first of the individual moving defendants made their initial appearances in this case and secured their release from jail. (Filings 3–20.)

**B.**

The INS did not have the input of the United States Attorney's office when it conducted the interviews or removed the illegal aliens. It also does not appear that the United States Attorney's office was asked to review the interview forms before the aliens were removed from this country.[6]

It is difficult to summarize the actual results of the interviews. This is because many of the interviews were not conducted in accordance with the amended I–213 form and the instructions that the agents were given regarding those forms. Specifically, the agents frequently failed to fill out the amended I–213 form correctly by providing the special information called for on the amended form or the agents never asked the special questions called for on

---

4. At the time of the raid, Nebraska Beef employed about 1,000 people. (Filing 172 at 80:7–10.)

5. Some were allowed a "voluntary return," meaning that they were returned to their country of origin without a formal deportation order as soon as arrangements could be made by the INS.

6. In fact, the INS had great difficulty finding all the interview forms and producing those forms to its own counsel for the evidentiary hearing held in February of 2002. As Judge Jaudzemis lamented, the record remains unclear as to whether all the forms used in the interviews were located. (Filing 175 at 5–6, 11–12.)

the form. Consider the following exchange between defense counsel and one of the agents:

Q. Okay. And as we go through all of these forms, when we see the form indicates when responses are given, that would indicate who the individual said recruited him, correct?

A. Yes.

Q. Now, in many of these forms, Mr. Gran, there's simply a blank or a line. Like if we look at page ten, there's a line through it.

A. I see that line.

Q. Can you we assume that the individual, when we see that line, was not recruited by anyone?

A. Perhaps.

Q. And what were the instructions that evening on whether to fill out all of the blanks?

A. I recall that we were supposed to complete the form.

Q. Okay. So if we see a form where it says recruited by and it's blank, or if it—can we assume then that the individual was not recruited by anyone?

A. If the question was blank?

Q. Blank.

A. Either that or else the question wasn't asked.

Q. But the questions were to be asked by every interviewer that night, were they not?

A. That's correct.

(Filing 164 at 69:12–70:11, referring to Ex. 16 (amended I 213 forms).)

It was clear to the agents that they should seek and record information about the knowledge of the defendants. But the agents frequently failed to do that. Consider, for example, the following exchange

between defense counsel and one of the agents:

Q. Isn't it a fact that this particular raid was different, because instead of just going into a plant to remove illegal aliens, you were going into the plant with the target being the employer?

A. There were differences, yes.

Q. And this would be the first time where you would be interviewing illegal aliens to determine the culpability or the—the culpability of an employer?

A. Yes.

Q. All right. And that's why you did it? One of the reasons you went in there was to determine what the employer knew?

A. That's correct.

Q. Okay. Where on that I213 [7] is that question asked, what did the employer know?

A. With respect to your specific question, I do not see it.

Q. Were the interviewers told to ask that question, what did the employer know?

A. I don't recall specifically how the question was worded.

Q. But they were to get that information?

A. Yes.

Q. Why isn't it recorded?

A. I don't have that answer.

(Filing 164 at 61:20–62:19.)

There are numerous instances where the amended I–213 form was not completed properly regarding the special questions added to the form. At least 55 of the forms, or roughly 25% of the interviews, were not completed as required by the form and the pre-raid instructions. (Ex. 2,

---

7. In the transcripts of the hearing, the court reporter designated the interview sheets as "I213" and "I9" rather than "I–213" and "I-

9." Quotations from the transcript have not been altered to add a hyphen.

¶¶ 5–7 (Aff. Robert A. Mooney); Ex. 8 (list by name and INS case number); and Ex. 9 (incomplete amended I–213 forms)).

Despite the difficulty in summarizing the interviews caused by the failure of the agents to follow their instructions, much of the information provided by the aliens was admittedly exculpatory. The case agent, Matthew Archer, testified to an example of an excluded alien [8] who could have given exculpatory testimony in favor of all the moving defendants:

Q. All right. So we know from this particular interview that this individual would be able to testify if she were called to trial that she completed the I9 by herself, right?

A. Yes.

Q. We would know that she would be able to testify at trial that she did not obtain these documents from Nebraska Beef or any of its employees?

A. She has the ability to do that.

Q. Okay. And we would know that she would testify at trial that she in fact rented these documents from a lady— from somebody by the name of Carmen Ramos, correct?

A. She could testify to that, yes.

Q. Well, the fact that she could testify that she completed the I9 by herself is exculpatory to Nebraska Beef, correct? That's one of the counts?

Mr. MORRIS: I'll object, Your Honor.

THE COURT: Overruled. You may answer from a factual standpoint.

THE WITNESS: Could you repeat the question.

Q. (By Mr. Lamson) The fact that she could testify that she completed the I9

*herself is exculpatory to the Defendants?*

A. Yes.

Q. *Okay. The fact that she obtained the documents from someone other than Nebraska Beef or its employees is exculpatory to the Defendants?*

A. Yes.

(Filing 172 at 60:2–61:5, referring to Ex. 19, beginning with a page marked 40 (in ink) and following pages.) [9] (Emphasis added.)

The case agent also admitted that at least one of the aliens could have given exculpatory testimony regarding all of the defendants, and 61 of the aliens could have given exculpatory information regarding Mr. Martinez. Under the following questioning, the case agent admitted:

Q. Directing your attention to Exhibit Number 24 that's in front of you. On the index number three, Mariso Sandival Garcia, which would be at page 11—I'm sorry, page eight. Do you have that in front of you, sir?

A. Yes.

Q. On page—the main page, or page one of the form I213, it indicates, does it not, on the bottom third that the subject was hired by Julian Martinez on December 5th of 2000, true?

A. That's what's reported.

Q. Means of travel to Omaha was vehicle with, what appears to be, imposter at Lar?

A. Laredo. Port of entry.

Q. At Laredo. Okay. Eighteen hundred dollars for the trip, true?

---

8. After initially being released on her recognizance, this alien was "voluntarily returned" to her country of origin. (Filing 172 at 62:11–13.)

9. In later questioning by the government's counsel, the agent made a confused attempt

to explain and then retract his earlier admissions regarding the fact that some of the aliens' testimony would have been exculpatory. (*Id.* at 82:2–84:13.) The agent's explanation is incomprehensible.

A. That's what's reported.

Q. And she indicates on page two that she obtained her documents from Laura Flores in Omaha, true?

A. Yes. That's what she said.

Q. Did you or others in your agency attempt to make contact or locate Ms. Laura Flores?

A. No.

Q. *As to the supplying/making/manufacture of illegal identification, was her response in that—on that particular I213 exculpatory as to Mr. Martinez and others indicted?*

A. Yes.

Q. And I don't want to belabor the fact, sir, I'm sure you've gone through these. Aren't there a number of entries in these I213's, specifically these 61 in front of you in Exhibit Number 24, where individuals advised INS agents that they've obtained their documents from aunts, cousins, brothers, people in Omaha, in Texas, all kinds of responses in terms of where they obtained their documents and who assisted them in obtaining these documents, right?

A. Yes.

Q. And in any of those I213's, does anyone say that Mr. Martinez assisted them in purchasing or manufacturing or obtaining illegal documentation?

A. Not to my knowledge.

Q. *Would you say that that was exculpatory information as to Mr. Martinez?*

A. Yes.

(Filing 172 at 69:2–70:21.) (Emphasis added.)

For yet a third example, the case agent testified that none of the illegal aliens even mentioned Mr. Nguyen. That is,

Q. Given your review of the I213's, have you discovered in that review that any of the individuals answering the questions given or asked of them by the agents indicated that they had been recruited or hired by Mr. Nguyen?

A. On the two hundred and—that were removed from—No.

Q. Yes, sir. Did any indicate that they had obtained documents, illegal or otherwise, from Mr. Nguyen?

A. No.

Q. Did any indicate in answering their I213's that Mr. Nguyen and/or Mr. Martinez had assisted in their travel to Omaha?

A. Not to my knowledge.

(Filing 172 at 71:4–18.) [10]

Other interviews were thought to be potentially exculpatory by the agents conducting them and the agents reported that view to their supervisors. However, the record reveals no serious attempt to detain those aliens as material witnesses, to clarify the situation or to take sworn statements from them to preserve their potentially exculpatory testimony. For example, consider the following exchange between Agent Johanns and one of the defense lawyers:

Q. All right. Well, if we go to page 311 of Exhibit 16, and we look at the information you've recorded there, we learn that—let's see, this name is—what's this individual's last name?

A. Martha Lozano.

Q. Okay. Let's refer to him as Mr. Lozano, if you don't mind. Mr. Lozano told you he didn't know who he was hired by?

A. Correct.

---

**10.** The examples cited in the text are not the only instances where agents testified directly or indirectly that the aliens could give exculpatory testimony. See, for example, Filing 172 at 71:23–72:25, regarding an agent's testimony about the interview forms and the absence of information implicating Mr. Villarreal–Carrillo.

Q. And he told you he was recruited by an individual by the name of Fostano Maja?

A. Fostino Majia.

Q. Majia. And that he was recruited before he entered the United States?

A. Correct.

Q. And he came to this country by airplane?

A. Correct.

\* \* \*

Q. All right. Let's go to the next page, which is page 312, of Exhibit 16. And from page 312 in the initial information in filling out the forms, at least he initially indicated to you he didn't remember the documents he presented for employment, nor did he remember if anybody helped him in completing the I9, correct?

A. Correct.

Q. And he again repeats the name of the individual that he obtained the documents from, and this time he tells you that he got those documents in Omaha, Nebraska?

A. Correct.

\* \* \*

Q. An old family friend told him about the job and picked him up at the airport?

A. Correct.

\* \* \*

Q. All right. He told you his friend's name was Fosto Majia, and that Mr. Majia also provided the documents for employment?

A. Correct.

Q. All right. So from your interview of this individual, Mr. Johanns, this individual could testify that he was not recruited by Nebraska Beef?

A. Well, he could testify that he was recruited by Fostino Majia, or provide that information by his friend.

\* \* \*

Q. Did you report this to your supervisor, this interview?

A. Yes, I did.

Q. You did?

A. Yes, I took the interview sheets up to the supervisor and showed him what I had.

Q. Okay. Because you thought it was important?

A. Yes.

\* \* \*

Q. *Didn't you recognize that this individual possessed exculpatory material?*

A. *Looking at the time, I did not think there was any association with the Nebraska Beef case one way or other. I thought it would have been exculpatory, if anything, if we were conducting a different criminal investigation toward his friend Majia.*

Q. Well, I mean, Mr. Johanns, this person was picked up at Nebraska Beef. He was working at Nebraska Beef.

A. Correct.

Q. *He had information as to who recruited him, and it wasn't Nebraska Beef. He had information as to who gave him his documents, and it wasn't Nebraska Beef. That's exculpatory, isn't it?*

A. *I would presume possibly.*

Q. And he was later deported, wasn't he?

A. I think so.

(Filing 165 at 59:1–60:16; 61:15–25; 62:23–25; 63:11–19; 66:4–11; 67:3–20.) (Emphasis added.) (See also Filing 165 at 70:13–72:19 regarding a second individual whose

interview sheet was taken to a supervisor by Agent Johanns.)

## II. DISCUSSION

■ The Sixth Amendment's assurance of compulsory process and the Fifth Amendment's guarantee of due process both prohibit the government from seizing illegal aliens and removing them from this country when the result of that action is to deny criminal defendants favorable and material testimony from those absent aliens. *United States v. Valenzuela–Bernal,* 458 U.S. 858, 873–74, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (when a witness has been deported prior to a criminal trial, the defendant can demonstrate a denial of compulsory and due process which require the dismissal of the indictment if he or she makes "a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses.") Although infrequently, the government sometimes runs afoul of the *Valenzuela–Bernal* doctrine, and the courts have dismissed the government's charges as a consequence. *See, e.g., United States v. Lin,* 143 F.Supp.2d 783 (E.D.Ky.2001) (after being indicted in a 71–count indictment charging them with employing illegal aliens in their businesses, the defendants made a plausible showing that the deported aliens, who were found at the target businesses during an INS sweep, would have provided material and favorable testimony as to the defendants' knowledge of whether the aliens or other workers were illegal; indictment dismissed).

■ While not explicitly required by *Valenzuela–Bernal,* some circuits have re-quired that defendants also prove that the government's removal action was a result of "bad faith." *See United States v. Chaparro–Alcantara,* 226 F.3d 616, 623–24 (7th Cir.), *cert. denied,* 531 U.S. 1026, 121 S.Ct. 599, 148 L.Ed.2d 513 (2000); *United States v. Iribe–Perez,* 129 F.3d 1167, 1173 (10th Cir.1997); *United States v. Dring,* 930 F.2d 687, 693–94 (9th Cir.1991), *cert. denied,* 506 U.S. 836, 113 S.Ct. 110, 121 L.Ed.2d 68 (1992); *Buie v. Sullivan,* 923 F.2d 10, 11–12 (2nd Cir.1990); *United States v. McLernon,* 746 F.2d 1098, 1121 (6th Cir.1984).[11] Although an open question in the Eighth Circuit, it is likely that "bad faith" would be required if our Court of Appeals were to consider that issue. Accordingly, like Judge Jaudzemis, I decide that the defendants are obligated to prove bad faith in order to secure dismissal of the indictment.

### A. Bad Faith

■ The element of bad faith can be proven in one of two ways. "To establish that the government acted in bad faith, [a defendant] must show either 'that the Government departed from normal deportation procedures' or 'that the Government deported [the aliens] to gain an unfair tactical advantage over [the defendant] at trial.'" *Pena–Gutierrez,* 222 F.3d at 1085 (quoting *Dring,* 930 F.2d at 695). The proper focus is "on the Government's knowledge when, exercising its deportation authority, it arranged for the departure of the witnesses, not on any of its subsequent conduct." *Chaparro–Alcantara,* 226 F.3d at 624.

■ When the evidence is viewed with these standards in mind, I agree with

---

**11.** The *Valenzuela–Bernal* opinion stated that: "[T]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's *good-faith determination* that they possess no evidence favorable to the defendant in a criminal prosecution." *Valenzuela–Bernal,* 458 U.S. at 872–73, 102 S.Ct. 3440 (emphasis added). It is from this language that the cases draw the conclusion that bad faith must be proven.

Judge Jaudzemis (filing 175 at 16–17) that the defendants have proven that the government acted in bad faith. In particular, I find that the government did not follow its own deportation procedures and that the INS agents knew they were deviating from those procedures at the time of and shortly after the interviews.

It is undisputed that the normal INS procedure in a case involving a sweep to obtain evidence of a targeted criminal prosecution was to faithfully search for and preserve exculpatory evidence, as well as to gather and preserve inculpatory evidence. The record overwhelming reveals that the agents wholly failed to follow the practice of faithfully searching for and preserving exculpatory evidence, and the record reveals that they knew it. Three examples illustrate the point.

First, the I–213 form was amended by the INS to require the agents to gather pertinent information in a particular format. The agents were instructed to fill out the amended form. Yet, in a significant percentage of the cases the amended I–213 forms were not filled out as required. In so doing, the agents either failed to ask the required questions or failed to record and preserve the information. In any case, this deviation from the INS norm made a mockery of the practice of seeking and preserving exculpatory information before removing aliens from this country.[12]

Next, it was clearly the policy of the INS not to remove anyone who the INS agents believed possessed exculpatory information. As described earlier, the government's case agent admitted that information from some of the removed aliens was "exculpatory." While that same agent later tried to recant or qualify that admission, I do not find those statements worthy

of belief. As a result, the fact is that at least some of the aliens who were removed possessed exculpatory information according to the government's case agent, and yet those aliens were removed despite an INS policy to the contrary.

Third, it is undisputed that if the interviewing agents had a question about whether an alien possessed exculpatory information, INS policy dictated that such information should have been reviewed by a supervisor so that appropriate action could be taken to preserve the potentially exculpatory information. Despite the fact the one agent testified that he made at least two referrals for review by supervisors to determine the existence of potentially exculpatory information, and despite the fact that the case agent testified that at least some of the aliens in fact possessed exculpatory information, the record reveals no serious attempt on the part of the supervisors to detain those aliens as material witnesses, to clarify the situation or to take sworn statements from them to preserve their potentially exculpatory testimony. Once again, a significant deviation from the norm has been established.

In summary, the government acted in bad faith. It did not follow its own deportation policy for cases involving a targeted criminal prosecution. It promulgated procedures designed to unearth and preserve exculpatory testimony prior to removal, but the agents failed to follow those procedures.

### B. Material and Favorable Testimony

While believing that it "is a very close question," Judge Jaudzemis found that the information from the excluded aliens was not "material." (Filing 175 at 21.) With that conclusion I disagree.

---

**12.** The government refers to this and similar behavior as "sloppiness." I disagree. Several instances might merely be sloppy. A wholesale failure to follow customary procedures equals bad faith.

In cases like this one, where the government has in bad faith put the aliens beyond reach, the defendants are required to make some *"plausible* showing that the testimony of the deported witnesses would have been *material* and *favorable* to [the] defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela–Bernal,* 458 U.S. at 873, 102 S.Ct. 3440 (emphasis added). As Chief Judge Forester has recently said in a similar case,

> In making this determination, the Court keeps in mind the Supreme Court's observations that the witnesses' unavailability—through no fault of the defendants—"may well support a relaxation of the specificity required in showing materiality" and the defendants in this situation "cannot be expected to render a detailed description of their lost testimony."

*Lin,* 143 F.Supp.2d at 789 (quoting *Valenzuela–Bernal,* 458 U.S. at 870 & 873, 102 S.Ct. 3440).

In the context of aliens removed by the bad-faith conduct of the government, the Supreme Court has not given us specific instructions about the meaning of the words "material and favorable." But, the Court has said that "sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Valenzuela–Bernal,* 458 U.S. at 873–74, 102 S.Ct. 3440.

Shortly after *Valenzuela–Bernal,* the Supreme Court, after discussing that case, decided *California v. Trombetta,* 467 U.S. 479, 486, 104 S.Ct. 2528, 81 L.Ed.2d 413

(1984) (the failure to preserve a breath sample did not violate the Fourteenth Amendment guarantee of due process). The Court stated that the constitutional duty of the government to preserve evidence is limited "to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488, 104 S.Ct. 2528. In other words, such "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. 2528. Given the Court's reliance upon *Valenzuela–Bernal,* the *Trombetta* opinion adds meaning to the words "material" and "favorable."

In deciding whether the evidence would have been "material and favorable" in this case, I approach that task with the foregoing principles in mind. After so doing, I decide that the defendants have made a plausible showing that the testimony of many of the aliens who were removed by the bad-faith conduct of the government would have been both material and favorable to the defense. The following points will illustrate why I come to this conclusion.

At the most basic level, the government has now effectively conceded that the evidence derived from the aliens is central to this case. In its objection arguing that I should overrule Judge Jaudzemis and allow it to use the evidence from the removed aliens, the government stresses that such evidence constitutes "a large portion of the government's case pertaining not only to forfeiture but also pertaining to the case in chief." (Filing 180 at 6.)[13] To arrive at this conclusion, the gov-

---

**13.** In fairness to Alan Everett, the government's very capable lawyer who wrote the quoted objection, he was not the Assistant United States Attorney who brought this case.

He also was not responsible for the government's presentation before Judge Jaudzemis. That lawyer has now left government service,

ernment can only be relying upon the same interviews that the defendants rely upon. If that evidence "constitutes a large portion of the government's case," and if the government must rely upon the same interviews that the defendants rely upon, there is no reason to think the opposite is not equally true. That is, it is perfectly plausible to believe that such evidence also "constitutes a large portion of the [defendants'] case."

Second, the defendants have unmistakably proven that many of the excluded "witnesses had information relating directly to the defendants' knowledge of whether their workers were illegal," and that evidence is certainly both material and favorable to the defense of employing illegal aliens. *Lin*, 143 F.Supp.2d at 789 (where the defendants were charged in a 71 count indictment with employing illegal aliens, and the defendants made a plausible showing that the deported witnesses who worked at the defendants' business would have provided testimony on the issue of the defendants' knowledge as to whether they or other workers were illegal, the court dismissed the indictment). For example, many of the aliens could have testified that they procured their documents from sources wholly unrelated to any of the defendants,[14] and some of the aliens could have testified that none of the defendants helped them fill out bogus forms. (Filing 172 at 60:2–61:5, referring to Ex. 19, beginning with a page marked 40 (in ink) and following pages; Filing 172 at 69:2–70:21.) As the agents admitted during the hearings, this evidence was clearly exculpatory, and it was perfectly apparent at the time of the interviews.

Third, Judge Jaudzemis' concern that the evidence from the aliens would not specifically rebut each overt act or sub-

stantive count misses the mark. Initially, for evidence to be favorable and material, none of the cases require that it serve as a defense to every government allegation. On the contrary, the question is whether the evidence "might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488, 104 S.Ct. 2528.

The government clearly charged the fruits of the December 5, 2000, raid as a central part of the conspiracy. Indeed, the deported aliens are the corpus of the crime. To the extent a number of those same aliens would have testified that the conspirators did not provide them with fake documents or help them fill out phony forms, the principal and overarching charge of the government—the conspiracy—would have been dealt a severe blow. If the conspiracy was not believed, then the substantive counts, which were alleged to have been committed in furtherance of the conspiracy, would probably fail as well.

Still further, the overt acts and the substantive counts are based in significant part upon on the conduct of two confidential informants and an undercover INS agent. Testimony from admitted illegal-alien witnesses found at Nebraska Beef, who had no bias in favor of the government or the defendants, that corroborated the assertion of the defendants that they did not intentionally and knowingly provide bogus forms or help to fill them out would have served to dilute the significance of the testimony of the informants and undercover agent. In a similar vein, such testimony would buttress the defendants' obvious mistake defense. Moreover, these alien witnesses "are perhaps the *only* witnesses who may have information the defense could use to impeach" the confidential informants and the undercover

---

and this case has fallen to Mr. Everett. (Lucky him!)

**14.** The same was true in *Lin. Id.* ("[T]hey had purchased fraudulent documents from persons other than the defendants.")

agent. *Lin*, 143 F.Supp.2d at 790 (emphasis in original). Thus, it is wrong to suggest that the alien witnesses would not have played a significant role in the defense to the overt acts and the substantive counts.

Fourth, the exculpatory testimony of the aliens would not have been cumulative and could not have been provided by anyone else. These witnesses were the heart of the alleged offense. After all, that is why the government used over 100 agents to raid Nebraska Beef on December 5, 2000, and that is why the superseding indictment alleges a conspiracy spanning December 5, 2000. No other witnesses could provide an unbiased, equally effective substitute for their exculpatory knowledge of what went on at Nebraska Beef.[15]

In summary, the defendants have made a "plausible showing" that the "testimony [of the aliens removed by the government in bad faith] would have been both material and favorable to [the] defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela–Bernal*, 458 U.S. at 873, 102 S.Ct. 3440. The defendants are therefore entitled to the relief they seek.

### C. The Government's Dilemma

I fully recognize and respect the fact that these cases provide the government with a serious dilemma. *Id.* at 863–66, 102 S.Ct. 3440. On the one hand, the government must enforce the criminal laws. On the other, it must enforce the immigration laws. In so doing, it must also be sensitive to the very real humanitarian concerns which require it to act in a prompt fashion when dealing with the often poor and abused illegal aliens who become wards of the government. "It simply will not do, therefore, to minimize the Government's dilemma in cases like this." *Id.* at 865, 102 S.Ct. 3440. That said, I only require that the government faithfully abide by its own procedures.

IT IS ORDERED that:

1. The motions to dismiss the indictment (filings 144, 146, 147, 152, and 155) are granted. By separate document this case will be dismissed with prejudice against Nebraska Beef, Ltd., Nebraska Beef, Inc., Kim V. Nguyen, Mario Villarreal–Carrillo, a/k/a Mario Villarreal–Carlos, Tony N. Joy and Julian Martinez.

2. The report and recommendation (filing 175, part one) is rejected to the extent that it suggests that the motions to dismiss be denied. The defendants' objections (filings 182, 183, 184, 185 and 187) to the report and recommendation are sustained. The government's objections (filings 180 and 186) are denied.

3. The government's appeal (filings 180 and 186) from the Magistrate Judge's order (filing 175, part 2) prohibiting the government from using the fruits of the December 5, 2000, raid at trial is denied as moot.

---

**15.** If the government argues that a few of the aliens may still be in this country or may have returned to this country and thus they are available to the defense, such an argument is of the "make weight" variety. Since the government does not know where the aliens are despite having seized them, there is no reason to think the defendants can find them. Moreover, it is undisputed that the great bulk of the alien witnesses are in a foreign country beyond the reach of the defendants.