**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 99-20500

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LOUIS VICTOR PEREZ, also known
as Louis Victor Perez Chairez,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

June 29, 2000

Before POLITZ, JOLLY, and BARKSDALE, Circuit Judges.

POLITZ, Circuit Judge:

Louis Victor Perez appeals his conviction and sentence on two counts of aiding and abetting the harboring of an undocumented alien in violation of 8 U.S.C. § 1324(a) and 18 U.S.C. § 2. For the reasons assigned, we affirm.

## BACKGROUND

On March 19, 1998, the Houston Police Department (HPD) received a telephone call from Sandra Flores who reported that her daughter, Merced Caletre-

Flores, and two grandchildren were being held hostage at a house in Houston. Caletre-Flores and her children had been smuggled into the United States, and Flores claimed that they would not be released until the smugglers had received payment for their services. Flores admitted that she was in the country without authorization and provided the HPD with a telephone number of the house where her daughter and grandchildren were being held. HPD notified the Immigration and Naturalization Service. INS agents traced the telephone number to the residence located at 8505 Lenore Street,[1] set up a surveillance, and observed people freely leaving and entering with grocery bags. They saw codefendant Francisco Perez-Ordones mowing the lawn. At one point Perez came out of the house and conversed briefly with Perez-Ordones.

At about 5:00 p.m. the INS and HPD executed a search warrant of the house and arrested 24 undocumented aliens, 20 of whom were found inside the house. As the officers approached the house, Perez-Ordones attempted to flee, but was quickly detained. Many of the aliens were "very dirty" and "dressed poorly." Perez, the only United States citizen arrested, was found near a sleeping pallet in the garage located off the living room of the house. As Perez was handcuffed, he stated "I don't let them over here." Prior to execution of the search warrant, codefendant Elma Glorisabel Umanzor had been observed leaving the house with another Hispanic female. INS agents followed Umanzor to a local grocery store where she conducted business at the moneygram counter. The agents confronted

---

[1]The house was owned by Joel Perez and rented by the defendant. The record contains no evidence that the two were related.

Umanzor as she and the other female returned to the parking lot and arrested her after determining that she too was an undocumented alien. Umanzor possessed some cash and Western Union receipts which were later determined to be connected with the alien smuggling operation.

Agents concluded that the Lenore Street residence was a "drop house," a house holding aliens pending their full payment for smuggling services and transportation to their final destination. Several notebooks containing the names of aliens, the telephone numbers of their relatives who could be contacted for money, and records of completed wire transfers were found in the house. One of the notebooks contained writing on the inside cover addressed to "Louis." This notebook was found in Perez's living quarters and contained several entries, dated February 1998, indicative of an alien smuggling operation. One entry read, "took new truck with Georgia, 7 people and 1 guia."[2] Another read, "2 people picked up at Falfurrias at 9:30 p.m. on Road 425."[3] The notebook also contained a number of similar entries.[4] The next day, March 20, 1998, a criminal complaint was filed charging Perez, Umanzor, and Perez-Ordones with aiding and abetting each other in the harboring of "an alien" in violation of 8 U.S.C. § 1324(a)(1) and 18 U.S.C. § 2. The affidavit attached to the complaint reflected that 24 undocumented aliens

---

[2]"Guia" is Spanish for "guide." Guias typically aid aliens in getting around the border checkpoints.

[3]There is a border checkpoint at Falfurrias, Texas.

[4]The government's expert testified that the writing in the notebook matched Perez's handwriting.

had been arrested, but the complaint did not charge the defendants with harboring a specific alien.

The INS immediately took custody of the aliens. On March 25, 1998, after preliminary and detention hearings, the INS gave defense counsel a list of names and locations of the detained aliens. At that time, only four had been released on their own recognizance, including Merced Caletre-Flores and her two children. The INS deported six of the detained aliens the next day; five more on March 31; and another on April 1. One had been released on bond on March 31. As a result, the defense was able to interview only five of the 24 undocumented aliens taken from the house.

The three defendants were indicted for one count of aiding and abetting the harboring of an undocumented alien, Merced Caletre-Flores. Shortly before trial the government discovered that Caletre-Flores and her two children, along with her mother Sandra Flores, had "disappeared" after being released on bond. A superseding indictment charged Perez and the codefendants with two counts of aiding and abetting the harboring of Jose Amado Aguilar-Jimenez and Jose Chevez-Nolasco. Both undocumented aliens were listed in the affidavit attached to the original complaint.

On the eve of trial Perez's codefendants pled guilty to both counts in the superseding indictment. The first trial resulted in a hung jury. On retrial, the jury returned guilty verdicts on both counts. The Presentence Investigation Report characterized Perez's role in the offense as one of a manager/supervisor. Perez's objections to the information contained in the PSI were rejected and the court

4

imposed concurrent sentences of 51 months' imprisonment and three years' supervised release. Perez timely appealed.

Perez raises several issues on appeal. He first contends that the indictments should have been dismissed because the swift deportation of the alien witnesses violated his right to compulsory process under the sixth amendment and his right to due process under the fifth amendment. Perez further contends that the superseding indictment should have been dismissed because it was filed five months after the filing of the complaint in violation of the Speedy Trial Act.[5] Perez also claims that the district court abused its discretion by excluding the deported aliens' out-of-court statements to the INS agents and by restricting defense counsel's cross-examination of a government witness. Perez also contends that the trial court's limitation on cross-examination violated the confrontation clause of the sixth amendment. Perez's final complaint is that the district court erroneously imposed a two-level upward adjustment for his role as a manager/supervisor in the offense. We address each of these issues in turn.

## ANALYSIS

### 1. Deportation of undocumented aliens:

Perez unsuccessfully moved to dismiss both indictments, alleging that the deportation of the alien witnesses before they could be interviewed by the defense deprived him of his sixth amendment right to compulsory process and his fifth amendment right to due process. The defense theory in both trials was that Perez

---

[5] 18 U.S.C. § 3161 *et seq.*

5

was not involved in the alien smuggling operation and did not harbor any of the undocumented aliens but, rather, he merely resided in the garage apartment attached to the residence where the aliens were being housed. He claimed that on the day of his arrest he was alone in his room recovering from an illness. Perez contends that the deported witnesses could have corroborated his claim of mere presence. Additionally, he claims that their statements would have contradicted directly the testimony of Jose Aguilar-Jimenez and Jose Chevez-Nolasco, both of whom testified that Perez ordered them into the house upon their arrival and instructed them to remain in the bedrooms hidden from view. We review the constitutional challenge *de novo*.[6]

Because of its duty to execute the immigration policy adopted by Congress, the government may deport undocumented alien witnesses upon a good-faith determination that they possess no information favorable to a criminal defendant.[7] To establish a compulsory process or due process violation, a criminal defendant must make a "plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses."[8] The sanction of dismissal is warranted "only if there is a reasonable likelihood that the testimony could have affected the

---

[6]**United States v. Sierra-Hernandez,** 192 F.3d 501 (5th Cir. 1999), *cert. denied,* 120 S. Ct. 1213 (2000).

[7]**United States v. Valenzuela-Bernal,** 458 U.S. 858 (1982).

[8]**Id.** at 873.

judgment of the trier of fact."[9] Our review of the record persuades that the claimed constitutional violations did not occur herein.

Upon their arrest, the aliens were interviewed by the INS to determine whether they had any information relevant to the criminal trial. Of the eight aliens deported before the indictment was returned, six could not identify Perez from a photo spread. Several stated that they did not see Perez until everyone at the house was arrested. Additionally, two of the deported witnesses stated that no one at the house asked them for money; one told the INS agent that no guias were at the house at the time it was searched; and another stated that no one in the house was a "coyote."[10] As Perez was not charged with smuggling aliens across the border or transporting them within the United States, the statements that there were no guias or coyotes in the house and that no one asked them for money is irrelevant to the issue whether Perez harbored or concealed from detection Aguilar-Jimenez and Chevez-Nolasco.[11]

Although the deported aliens who could not identify Perez or did not see him until their arrest may have provided testimony favorable to his defense, we reject

---

[9]**Id.** at 873-74.

[10]A "coyote" is a person in charge of smuggling aliens.

[11]**United States v. Romero-Cruz,** 201 F.3d 374 (5th Cir.), *cert. denied,* 120 S. Ct. 2017 (2000) (holding that testimony of deported witnesses was not material to defendant's conviction where testimony would have served only to impeach second alien's testimony on a collateral matter); **Sierra-Hernandez,** 192 F.3d at 503 (alien witnesses' presumed testimony that defendant was not hired to take them across the border was immaterial to whether he transported them within the United States).

his compulsory process and due process challenges because he has failed to show that their testimony was not merely cumulative of the testimony of available witnesses. Defense counsel was able to detain and depose six material witnesses, including Aguilar-Jimenez and Chevez-Nolasco. The district court did not err in denying these challenges by Perez.

## 2. *Speedy Trial Act:*

Perez next contends that his statutory right to a speedy trial was violated because the superseding indictment contained charges identical to the charge in the original complaint but different from the charge alleged in the first indictment. As the underlying facts are undisputed, we review the district court's interpretation of the Speedy Trial Act *de novo*.[12]

The Speedy Trial Act provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."[13] The Act further provides for mandatory and automatic dismissal of the complaint should the government fail to comply with the applicable time limits:

> If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by 3161(h) of this chapter, such charge against that individual

---

[12]**United States v. Bailey,** 111 F.3d 1229 (5th Cir. 1997).

[13]18 U.S.C. § 3161(b).

8

contained in such complaint shall be dismissed or otherwise dropped.[14]

If dismissal is required, the district court retains the discretion to dismiss the charges either with or without prejudice.[15] The statute's dismissal sanction is narrowly applied.[16]

As the Act specifically provides, dismissal of the charges is required only if an indictment is secured more than 30 days from the filing of a complaint and contains identical charges. Thus, in **Giwa,** we held that where the original complaint alleged credit card fraud, no violation of the Act occurred when the defendant was subsequently indicted for mail fraud and use of a false Social Security number, despite the fact that the offenses for which Giwa was arrested and indicted arose from the same criminal transaction.[17] Similarly, in **Bailey,** we held that § 3161(b) was not violated when the complaint charged misdemeanor offenses and a subsequent indictment, brought more than 30 days after the arrest, charged four felony violations of the same statute.[18] In the instant case there is no question that the first indictment timely charged Perez with the same offense alleged in the complaint.

---

[14]18 U.S.C. § 3162(a)(1).

[15]**Id.**

[16]**Bailey,** 111 F.3d at 1235; **United States v. Giwa,** 831 F.2d 538 (5th Cir. 1987).

[17]**Giwa,** 831 F.2d at 542-43.

[18]**Bailey,** 111 F.3d at 1236.

The Act is silent, however, with respect to the situation where the government obtains a timely indictment and thereafter secures a superseding indictment based on the same criminal transaction more than 30 days after the defendant's arrest. Courts addressing this issue have held that where the superseding indictment adds no new facts and contains charges identical to those in the original timely indictment, the filing of the first indictment tolls the speedy trial "clock."[19] In fact, even an indictment that is timely returned but later is found to be legally deficient has been held to satisfy the "any information or indictment" language of § 3161(b) if the subsequent indictment is materially identical to the first indictment, the government does not act in bad faith, and there is no prejudice to the defendant.[20] We conclude that the filing of the first indictment charging Perez with aiding and abetting in harboring Merced Caletre-Flores was sufficient to toll the clock for purposes of the filing of the superseding indictment charging

---

[19]**United States v. Berry,** 90 F.3d 148 (6th Cir. 1996) (30-day period tolled where superseding indictment alleged identical charges based on same facts as original indictment); **United States v. Palomba,** 31 F.3d 1456 (9th Cir. 1994) (superseding indictment charging mail fraud dismissed because identical charges had been alleged in complaint but not in first indictment); **United States v. Gonzalez,** 748 F.2d 74 (2d Cir. 1984) (where complaint alleged wire fraud in connection with Banco Hispano and first indictment charged wire fraud in connection with Banco Pinto, superseding indictment charging wire fraud in connection with Banco Hispano violated Speedy Trial Act); **United States v. Mitchell,** 723 F.2d 1040 (1st Cir. 1983) (superseding indictment did not violate 30-day arrest-to-indictment rule because it did not alter the original charges nor affect the Act's 70-day indictment-to-trial requirements).

[20]**United States v. Perez,** 845 F.2d 100 (5th Cir. 1988); **United States v. Rabb,** 680 F.2d 294 (3d Cir. 1982).

10

Perez with aiding and abetting the two codefendants in harboring Aguilar-Jimenez and Chevez-Nolasco. Perez insists that under **Palomba** the charges in the superseding indictment are not identical to the charge in the first indictment, but are identical to that contained in the original complaint. We disagree. In **Palomba,** the complaint accused the defendant of making false statements to a federal agency, mail fraud, and conspiracy, in violation of 18 U.S.C. §§ 1001, 1341, and 371. The first indictment complied with the time limitations of the Act and charged the defendants with conspiracy and making false statements to a federal agency.[21] The superseding indictment, filed more than 30 days after the defendant's arrest, charged Palomba with mail fraud, wire fraud, and making false statements to a federal agency. The court held that Palomba's counsel was ineffective for failing to move for dismissal of the mail fraud counts in the superseding indictment as untimely, as they had been raised in the complaint but omitted from the first indictment.[22]

By contrast, in the instant case the complaint and first indictment charged Perez with aiding and abetting two codefendants in harboring an undocumented alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (iii) and 18 U.S.C. § 2 on or about March 19, 1998.[23] The superseding indictment likewise charged Perez with

---

[21]**Palomba,** 31 F.3d at 1459.

[22]**Id.** at 1463.

[23]Actually, the first indictment alleged a violation of 8 U.S.C. § 1324(a)(1)(C), the statutory provision for the unlawful harboring of aliens as contained in the 1988 version of the United States Code. In 1994 the legislature

11

the same statutory violations based on the same underlying circumstances.[24] Thus, we conclude that the first indictment tolled the 30-day arrest-to-indictment clock.

That different aliens are named in the two indictments does not change our conclusion. We have noted that the purpose of the 30-day rule is "to force the Government to elect to proceed against the arrestee or to release him."[25] Other courts have observed that the rule "ensure[s] that the defendant is not held under an arrest warrant for an excessive period without receiving formal notice of the charge against which he must prepare to defend himself."[26] Our conclusion today satisfies both concerns. The timely filing of the first indictment reflects the prosecution's decision to charge Perez in connection with the events that transpired at the 8505 Lenore Street residence on March 19, 1998. And, as all three

---

renumbered § 1324 without changing the provision's wording. Thus, § 1324(a)(1)(A)(iii) is the corresponding harboring provision. *See* Pub. L. 103-322, § 60024, *reprinted in* 1994 U.S.C.C.A.N. 1981. Such a technical error in transcription, however, does not alter the result.

[24]**United States v. Castellano,** 848 F.2d 63, 65 (5th Cir. 1988) (filing of superseding indictment more than 30 days after defendant's arrest did not violate Speedy Trial Act because superseding indictment "was predicated on the same fraudulent acts as the earlier indictment"); **Berry,** 90 F.3d at 151; **United States v. Hsin-Yung,** 97 F. Supp.2d 24 (D.D.C. 2000) (dismissal of superseding indictment not required although second indictment contained violation of same statute as original complaint; second indictment alleged violation of different provisions of statute, and provisions were made up of different elements, proscribed different types of conduct and imposed different penalties).

[25]**Perez,** 845 F.2d at 102.

[26]**Berry,** 90 F.3d at 151.

accusatory instruments allege the same statutory violations, Perez was on notice of the charges against him.

Perez was not prejudiced by the filing of the superseding indictment, despite his complaint to the contrary. On April 6, 1998, 10 days prior to the return of the first indictment naming Caletre-Flores as the harbored alien, Perez designated five material witnesses for deposition, including Aguilar-Jimenez and Chevez-Nolasco. On April 10, the defense designated another material witness for deposition. The court thereafter ordered the detention of Aguilar-Jimenez and Chevez-Nolasco, three months prior to the return of the superseding indictment. Thus, as of April 10, Perez was alerted to prepare his defense against the charge of harboring any one of the twenty-four aliens named in the complaint, and later he was able to depose and ensure the presence at trial of the two aliens actually named in the superseding indictment. Further, the defense theory that Perez was an innocent bystander to the alien smuggling operation and that he merely resided in the separate garage apartment next to where the aliens were being housed was equally viable without regard to the number or identity of the aliens alleged to have been harbored. Thus, as the Speedy Trial Act was not violated and the defense suffered no prejudice, the district court appropriately declined to dismiss the superseding indictment.

### 3. *Admission of deported aliens' statements to INS agents:*

Perez claims that the trial court should have allowed him to introduce the statements made by the deported witnesses to INS agents under the residual

13

exception to the hearsay rule.[27] We review the admission or exclusion of evidence for abuse of discretion.[28] We will not disturb the trial court's ruling on the admissibility of evidence under the residual exception to the hearsay rule "absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors."[29]

The district court excluded the deported witnesses' statements because it concluded that they lacked the requisite circumstantial guarantees of trustworthiness. Perez counters that the aliens' statements were material and bore an indicia of reliability equivalent to declarations against interest because they were made to the very agency that would be responsible for their deportation and possible criminal prosecution, and because they were made at the same time as their admissions that they had entered the United States without the requisite

---

[27]Federal Rule of Evidence 807 provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

[28]**United States v. Ismoila,** 100 F.3d 380 (5th Cir. 1996).

[29]**Page v. Barko Hydraulics,** 673 F.2d 134, 140 (5th Cir. 1982); **Rock v. Huffco Gas & Oil Co., Inc.,** 922 F.2d 272, 281 (5th Cir. 1991) (noting "highly deferential standard of review" in evaluating district court's ruling on this issue).

authorization. Special Agent Bill Burkland of the INS, who had 12 years' experience in the anti-smuggling unit, testified that in the initial interview approximately ninety percent of undocumented aliens apprehended do not give a truthful and accurate account of the events that led up to their arrest. Indeed, both Aguilar-Jimenez and Chevez-Nolasco were designated initially as defense witnesses, but subsequently provided testimony implicating Perez in the smuggling operation. Further, the aliens made their statements to the agents during an informal interview and, thus, were not subject to cross-examination. Nor were the statements made under oath.[30] We therefore find no abuse of discretion.

### 4. Limitation on cross-examination of Aguilar-Jimenez:

Defense counsel sought to impeach the credibility of government witness Aguilar-Jimenez by establishing that he and Chevez-Nolasco had concocted their stories while confined at the Liberty County Detention Center. The questions asked by defense counsel pertained to the housing and physical conditions at Liberty County and, specifically, whether and how often the inmates were provided with an opportunity to talk freely with one another. Without asking Aguilar-Jimenez whether he spoke with Chevez-Nolasco or any other arrested alien before giving his deposition or trial testimony, however, Perez's attorney attempted to cross-examine him with respect to his April 22, 1998 deposition at which he

---

[30]**United States v. Sanchez-Lima,** 161 F.3d 545 (9th Cir. 1998) (holding that deposition testimony of deported witnesses had circumstantial guarantees of trustworthiness, in part, because the statements were made under oath and the aliens were subject to the penalties of perjury, the testimony was preserved on videotape, and the witnesses were subject to cross-examination).

stated that he did not talk to any other arrested alien after his arrest. The trial court did not allow pursuit of this line of questioning, concluding that it was peripheral, cumulative, and would tend to confuse the jury. Perez contends that the district court abused its discretion and violated his rights under the confrontation clause of the sixth amendment, claiming that the questions were crucial in establishing that Aguilar-Jimenez had lied at either his deposition or at trial. We are not persuaded.

The confrontation clause of the sixth amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him."[31] The Supreme Court has emphasized that "'the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'"[32] We previously have stated that "[t]he Confrontation Clause of the Sixth Amendment is satisfied where defense counsel has been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness."[33] Once it is determined that the sixth amendment has been satisfied, we review the district court's restrictions for abuse of discretion, mindful of the wide latitude afforded to the trial judge in imposing reasonable restraints on the scope of cross-

---

[31]U.S. CONST. amend. VI.

[32]**Davis v. Alaska,** 415 U.S. 308, 315-16 (1974) (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)); **Delaware v. Van Arsdall,** 475 U.S. 673, 678 (1986).

[33]**United States v. Restivo,** 8 F.3d 274, 278 (5th Cir. 1993) (internal quotations and citations omitted).

examination.[34] If an abuse of discretion has occurred, we review the error under the harmless error doctrine.[35]

Notwithstanding the restrictions imposed on defense counsel's cross-examination, the record reflects that counsel was able to elicit testimony from Aguilar-Jimenez that: (1) his trial testimony differed from his deposition testimony in that he stated at his deposition that Perez was in charge of giving the aliens food, whereas he testified at trial that Perez did not give them any food; and (2) he lied to the INS agents and defense investigators when they initially interviewed him by saying he had arrived at the Lenore Street residence on the day of his arrest when he actually had resided at the house for three days. Defense counsel was also permitted to cross-examine Aguilar-Jimenez about inconsistencies in the statements he initially gave to defense investigators and his testimony at trial regarding Perez's involvement in the alien smuggling operation, and whether the INS had promised to provide him with a work permit in exchange for his testimony. Defense counsel had an ample opportunity to impeach Aguilar-Jimenez's credibility. We must conclude that the district court neither violated Perez's sixth amendment right to confrontation nor abused its discretion in imposing the challenged limits on cross-examination.

---

[34]**Van Arsdall,** 475 U.S. at 679; **United States v. Freeman,** 164 F.3d 243 (5th Cir.), *cert. denied,* 119 S. Ct. 1590 (1999).

[35]**United States v. Townsend,** 31 F.3d 262 (5th Cir. 1994); **United States v. Moody,** 903 F.2d 321 (5th Cir. 1990).

## 5. Sentence enhancement:

Perez's final complaint is that the district court erroneously imposed a two-level enhancement to his base offense level under U.S.S.G. § 3B1.1(c) for having a supervisory role in the offense.[36] The PSI recommended the upward adjustment because Perez "provided the house for storing the smuggled aliens and directed the other defendants." We review *de novo* the district court's application of the sentencing guidelines and will uphold its findings of fact unless they are clearly erroneous.[37] A factual finding is not clearly erroneous if it is plausible in light of the entire record.[38]

At the sentencing hearing, the district court adopted the recommendations in the PSI in their entirety and, in large measure, made credibility assessments, rejecting suggestions by Perez that his involvement was scant and limited. We defer to the trial court's superior position in making such credibility calls.

Accordingly, for these reasons, we AFFIRM Perez's conviction and sentence.

---

[36]Section 3B1.1(c) provides for two-level increase if the defendant was an organizer, leader, manager, or supervisor in any criminal activity involving fewer than five participants. U.S.S.G. § 3B1.1(c) (1998).

[37]**United States v. Giraldo,** 111 F.3d 21 (5th Cir. 1997); **United States v. Patino-Cardenas,** 85 F.3d 1133 (5th Cir. 1996).

[38]**United States v. Ronning,** 47 F.3d 710 (5th Cir. 1995).