UNITED STATES of America,

v.

Cesar Javier HERNANDEZ.

No. CRIM. B–04–439.

United States District Court,
S.D. Texas,
Brownsville Division.

Nov. 5, 2004.

Anthony P. Troiani, Attorney at Law, Brownsville, TX, for Defendant.

## MEMORANDUM OPINION
## AND ORDER

HANEN, District Judge.

Defendant Cesar Javier Hernandez ("Defendant"), who was indicted for assaulting, interfering with, and resisting a federal officer, specifically a United States Border Patrol agent, moved to dismiss the indictment.[1] Given the nature of the allegations in this matter, this court has extreme reluctance to consider dismissing this case. This court is second to none in its appreciation of the service rendered to this nation by the members of the Border Patrol. Further, this court has in the past punished individuals guilty of endangering a member of the Border Patrol and will not hesitate to do so again in an appropriate case. Nevertheless, after careful consideration of the motions, the responses, the evidence presented at the hearing, and the applicable law, the court reluctantly GRANTS Defendant's motion and hereby dismisses the indictment for the reasons elaborated below.

## I. FACTS

For the most part, neither the Government nor defense counsel provided this court with much factual background. The facts of the incident from which the indictment arises, of which the most pertinent are highly contested, are discernible from the record and the parties' submitted exhibits. The undisputed facts are as follows: on May 28, 2004, Border Patrol agent David Robles ("Agent Robles") received a call from his partner, Border Patrol agent Charles Gantt ("Agent Gantt"), informing him that there were approximately eight illegal aliens on the levy near Oklahoma Road in Brownsville, Texas. Agent Robles responded to the call, and upon arriving at that location, which was a sorghum field, spotted several illegal aliens, two of whom were Defendant and Rosa Iselda Hernandez–Villela ("Villela"), Defendant's niece. Villela was pregnant at that time. When the undocumented aliens saw Agent Robles' Border Patrol vehicle, they disbursed in all directions. Agent Robles attempted to apprehend Defendant and Villela, and it is the facts surrounding their eventual apprehension that are vehemently disputed, with the Government and Defendant advancing two substantially different versions of the event.

According to the Government's portrayal of the incident, as Defendant and Villela were attempting to flee, Agent Robles told them to sit down. Instead of obeying, Villela aggressively approached Agent Robles and demanded that he strike her. Agent Robles called for assistance on his

1. The indictment states that the agent in question was a "Customs and Border Protection Agent." For ease of reference, this court will generically refer to the officers in question as Border Patrol agents.

radio, and Villela then ran. Agent Robles placed the microphone portion of his radio in his back pocket and gave chase. He caught Villela and grabbed her arm. Defendant then approached Agent Robles from behind; grabbed the agent's radio from his back pocket; and swung the radio, hitting Agent Robles in the nose. Agent Robles swung his baton several times, making contact at least once with Defendant's knee. Defendant fell, and Agent Robles attempted to subdue him. While Defendant and Agent Robles were struggling on the ground, Villela hit Agent Robles several times on the head with her purse. Agent Gantt then arrived at the scene. Villela stopped hitting Agent Robles and ran toward Agent Gantt, who detained her, and Agent Robles eventually subdued Defendant.

Defendant's version of the incident implicates Agent Robles as the aggressor. According to Defendant, as he and Villela attempted to flee, Agent Robles told them to stop and screamed obscenities at them. Villela responded with a vulgar retort. Agent Robles then pushed Villela, took out his baton, and told her he was going to hit her if she did not sit down. Defendant and Agent Robles also exchanged words; Agent Robles then grabbed Defendant and threw him to the ground, where the struggle between the two men ensued.

Regardless of whose version is to be believed, it is also undisputed that Defendant and Villela were arrested and taken into custody. After the incident, Robles went to Valley Regional Medical Center, where a doctor apprized him that his nose was fractured. Special Agent Andrew B. Jones ("Agent Jones") of the Federal Bureau of Investigation ("FBI"), Brownsville office—the Government's case agent—interviewed and took the statements of Defendant, Villela, Agent Robles, Agent Gantt, and another illegal alien, Jose Antonio Montalvo, between June 2 and June 4, 2004, and recorded the information imparted to him in typed reports.[2]

Defendant's counsel was appointed to represent Defendant on June 1st. A probable cause hearing was held before United States Magistrate Judge Felix Recio on June 4th. Defendant and Villela were indicted together in one indictment on June 15, 2004, for assaulting Agent Robles in violation of 18 U.S.C. § § 111(a) & (b).[3] The record does not show whether any of the other illegal aliens were indicted.

Defendant and Villela were arraigned on June 23, 2004, at which time they both pled not guilty to United States Magistrate Judge John Wm. Black. At the arraignment, a Scheduling Order was issued, which dictated that pretrial motions were to be filed by July 9, 2004, and responses to same were to be filed by July 23rd. A hearing on all motions filed was scheduled for July 29th.

On July 15, 2004, the Government filed a superceding criminal information charging Villela with the misdemeanor of interfering with Agent Robles while he was attempting to detain illegal aliens, in violation of 18 U.S.C. § 111(a)(1). That same day, Villela pled guilty to Magistrate Judge

---

**2.** It is not clear from the record whether the interviews themselves took place on these dates or whether the reports were completed on those days.

**3.** The indictment states that "[o]n or about May 28, 2004, in the Southern District of Texas and within the jurisdiction of the Court, Defendants, Cesar Javier Hernandez and Rosa Iselda Hernandez–Villela, did knowingly and forcibly assault, resist, oppose, impede, intimidate, and interfere with David Robles, a Customs and Border Protection Agent, while he was engaged in his official duties, and did inflict bodily injury on David Robles, In violation of Title 18, United States Code, Section 111(a) and 111(b)."

Black, was sentenced to time served, and was then deported.[4] On July 16th, the Government filed a motion to dismiss the original indictment against Villela, *but did not send a copy to Defendant's counsel.* This court granted the Government's motion on July 19th because Villela had plead guilty to the superceding criminal information.

It was at the motions hearing held before Magistrate Judge Black on July 29, 2004, that Defendant's counsel first learned that Villela had pled guilty to the superceding indictment and had been deported. At this court's August 10th final pretrial conference, Defendant's counsel orally requested a continuance, which was granted. Defendant's counsel then attempted to locate and subpoena Villela, but to no avail. On August 25th, Defendant's counsel filed a motion for leave of court to file late a motion to dismiss the indictment, which this court granted on August 31st at the final pretrial conference. Defendant's counsel filed a motion to dismiss the indictment on August 31st, alleging the deportation of Villela violated Defendant's Fifth Amendment right to due process and his Sixth Amendment right to compulsory process because the Government's action deprived Defendant of a potential witness, i.e., Villela. The Government filed a response that same day.

On August 31st, the court held an evidentiary hearing and heard oral argument pertaining to Defendant's motion. At the hearing, the parties referenced Agent Jones' reports, and the court ordered the Government to submit same to it for its inspection. On October 1st, Defendant's counsel filed an amended motion to dismiss the indictment, and the Government filed a response that same day.

## II. DISCUSSION

### A. Issues Presented

The primary issue before the court is whether Defendant's Fifth Amendment right to due process and his Sixth Amendment right to compulsory process were violated by the Government's deportation of Villela. However, before the court can address this question, the proper test to be employed must first be delineated. Specifically, the court must decide whether Defendant must show that the Government acted in bad faith when, in exercising its deportation authority, it caused the absence of Villela in addition to proving that Villela's testimony would have been material and favorable to his defense, and not merely cumulative to the testimony of available witnesses. Of note, the Government does not maintain that Defendant must prove bad faith. Defendant, on the other hand, contends that the Government bears the burden of proving that it acted in good faith when it deported Villela.

### B. Applicable Test

The Sixth Amendment guarantees a criminal defendant compulsory process "for obtaining witnesses in his favor."[5] U.S. Const. amend. VI. "This right is a fundamental element of due process law." *Washington,* 388 U.S. at 19, 87 S.Ct. 1920.

The seminal Supreme Court decision that established the test to determine whether a Sixth Amendment violation occurs when the Government deports an ille-

---

4. The record does not contain the exact time or date Villela was deported. However, under the standard procedure in this Division, an illegal alien who has been sentenced to time served would have been removed within twenty-four hours of sentencing.

5. The Sixth Amendment right to compulsory process to assure the presence of witnesses is applicable to the states through the Fourteenth Amendment. *Washington v. Texas,* 388 U.S. 14, 18, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967).

gal alien before defense counsel has an opportunity to interview the alien is *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In *Valenzuela,* the defendant was found guilty at trial on a charge of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2). *Id.* at 858, 102 S.Ct. 3440. The federal government had deported to Mexico two illegal aliens the defendant was charged with criminally transporting before the defendant had an opportunity to interview them to determine if they could provide him with material evidence to aid his defense. *Id.* The defendant argued that the aliens were necessary to his defense, and their unavailability due to the Government's action violated his right to compulsory process. *Id.*

The *Valenzuela* Court upheld the deportation. *Id.* The Court reasoned that the responsibility of the Executive Branch of the federal government to faithfully execute the immigration laws enacted by Congress justified the prompt deportation of illegal alien witnesses once the Executive Branch made a good-faith determination that the witnesses possessed no evidence favorable to the defendant in a criminal prosecution. *Id.* at 872, 102 S.Ct. 3440. The mere fact that the Government deported illegal alien witnesses thereby making them unavailable to the defense was not sufficient standing alone to show a violation of the compulsory process clause. *Id.* at 872–73, 102 S.Ct. 3440. The Court held that before the Government could be burdened with maintaining the aliens in this country as material witnesses, the defendant was required to make a sufficient showing that they could provide evidence that would be both "material and favorable to his defense, in ways not merely cumulative to testimony of available witnesses."

*Id.* at 873, 102 S.Ct. 3440. The Court further concluded that "sanctions [would] be warranted for deportation of alien witnesses only if there [was] a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 873–74, 102 S.Ct. 3440.

In *Valenzuela's* wake, numerous federal courts have addressed situations where criminal defendants moved to dismiss the indictment on the ground that the Government caused the unavailability of an alien witness due to deportation before a defendant could interview him. *See, e.g., United States v. Gastelum–Almeida,* 298 F.3d 1167 (9th Cir.), *cert. denied,* 537 U.S. 986, 123 S.Ct. 461, 154 L.Ed.2d 352 (2002); *United States v. Iribe–Perez,* 129 F.3d 1167 (10th Cir.1997); *United States v. McLernon,* 746 F.2d 1098 (6th Cir.1984). Interpretation of *Valenzuela's* doctrine, however, has not been uniform: several circuits have held that a defendant bears the initial burden of showing that the Government acted in bad faith—even though the *Valenzuela* Court did not explicitly require such a showing—and that the Government's conduct prejudiced the defendant's case, i.e., the deported witness' testimony would have been material and favorable to his defense, and not merely cumulative. *See United States v. Chaparro–Alcantara,* 226 F.3d 616, 623–24 (7th Cir.), *cert. denied,* 531 U.S. 1026, 121 S.Ct. 599, 148 L.Ed.2d 513 (2000); *Iribe–Perez,* 129 F.3d at 1173; *United States v. Dring,* 930 F.2d 687, 693–94 (9th Cir.1991), *cert. denied,* 506 U.S. 836, 113 S.Ct. 110, 121 L.Ed.2d 68 (1992); *Buie v. Sullivan,* 923 F.2d 10, 11–12 (2nd Cir.1990); *McLernon,* 746 F.2d at 1121; *United States v. Nebraska Beef, Ltd.,* 194 F.Supp.2d 949, 957 (D.Neb.2002).[6]

**6.** These cases base a defendant's obligation to prove bad faith upon the following language in *Valenzuela:* "the responsibility of the Executive Branch faithfully to execute the im-

In these circuits, to establish that the government acted in bad faith, a defendant must show either that the government departed from normal deportation procedures or that it deported the witness to gain an unfair tactical advantage. *United States v. Pena–Gutierrez*, 222 F.3d 1080, 1085 (9th Cir.), *cert. denied*, 531 U.S. 1057, 121 S.Ct. 670, 148 L.Ed.2d 570 (2000); *Dring*, 930 F.2d at 695. The focus is "on the Government's knowledge when, exercising its deportation authority, it arranged for the departure of the witnesses, not on any of its subsequent conduct." *Chaparro–Alcantara*, 226 F.3d at 624. The Seventh Circuit has further held that to show bad faith a defendant must prove "official animus" or a "conscious effort to suppress exculpatory evidence." *Id.*

Fifth Circuit case law is of little help in determining the applicability of bad faith as a factor, for the Court of Appeals has not directly addressed the issue of "bad faith" in its application of *Valenzuela's* principles. For instance, within the context of deporting alien witnesses, in *United States v. Perez*, 217 F.3d 323, 327 (5th Cir.), *cert. denied*, 531 U.S. 973, 121 S.Ct. 416, 148 L.Ed.2d 321 (2000), the Court noted that, under *Valenzuela*, "the government may deport undocumented alien witnesses upon a good-faith determination that they possess no information favorable to a criminal defendant." The *Perez* Court then stated that to establish a compulsory process or due process violation, a criminal defendant must make a plausible showing that the testimony of a deported undocumented alien witness would have been material and favorable to his defense, and not merely cumulative. *Id.* The *Perez* Court neither mentioned the defendant having the burden of showing bad faith, nor did the Court engage in any "bad faith" analysis. In *United States v. Romero–Cruz*, 201 F.3d 374, 377 (5th Cir.), *cert. denied*, 529 U.S. 1135, 120 S.Ct. 2017, 146 L.Ed.2d 965 (2000), the Court again noted

migration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." *Valenzuela*, 458 U.S. at 872, 102 S.Ct. 3440.

Some courts further rely upon *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), when determining that a Defendant must show bad faith. *See Chaparro–Alcantara*, 226 F.3d at 623; *Dring*, 930 F.2d at 694 n. 7. The issue before the Supreme Court in *Trombetta* was whether due process requires law enforcement agencies to preserve breath samples of suspected drunk drivers in order to introduce the results of breath-analysis tests in criminal prosecutions. *Trombetta*, 467 U.S. at 480, 104 S.Ct. 2528. The destroyed evidence—the test results on the breath samples—were used by the prosecution to secure the defendants' convictions. *Id.* The Court reasoned that:

[g]iven our precedents in this area, we cannot agree with the California Court of Appeal that the State's failure to retain breath samples for respondents constitutes a violation of the Federal Constitution. To begin with, California authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland*, [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and its progeny. In failing to preserve breath samples for respondents, the officers here were acting "in good faith and in accord with their normal practice." *Killian v. United States*, [368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961)].... The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence. 467 U.S. at 488, 104 S.Ct. 2528.

In *Arizona*, the Supreme Court discussed the standard for loss of evidence cases. The Court stated that unless the defendant could show bad faith on the part of the government, failure to preserve potentially useful evidence did not constitute a denial of due process of law. *Arizona*, 488 U.S. at 58, 109 S.Ct. 333.

that, under *Valenzuela*, "[t]he government is justified in promptly deporting alien witnesses after making a good faith determination that the witnesses possess no evidence favorable to the defendant in a criminal prosecution." The Court, however, stated that, to establish a violation of the right to compulsory process and due process, a defendant must show under *Valenzuela* that the testimony of the deported witness would have been material and favorable to his defense and noncumulative. *Id.* Again, the Court never explicitly required the defendant to show bad faith on the part of the Government, nor included any "bad faith" analysis in its reasoning.

The Fifth Circuit Court of Appeals came closest to requiring a defendant to show bad faith in *United States v. Sierra–Hernandez*, 192 F.3d 501 (5th Cir.), *cert. denied*, 528 U.S. 1178, 120 S.Ct. 1213, 145 L.Ed.2d 1115 (2000). The *Sierra–Hernandez* Court observed that other circuits, when addressing the meaning of the *Valenzuela* test, have strictly evaluated its requirements, *id.* at 503, and specifically noted that "[t]he Ninth Circuit has gone even further, interpreting Supreme Court precedent as requiring that the defendant also show bad faith by the prosecution." *Id.* at 503 n. 3. The Court then held that the defendant's rights were not violated because he failed to demonstrate "that the deported aliens would have provided testimony that was both material and favorable and reasonably likely to influence the trier of fact *or* that the government did not act in good faith." *Id.* at 503 (emphasis added). The Court, however, never discussed what constituted "good faith," as defense counsel conceded at oral argument that the government acted in good faith when it deported the aliens. *Id.* at 504. The Court also never discussed its use of the disjunctive "or" as most other courts have required the conjunctive "and."

A district court in this circuit has also not required that a defendant show bad faith. *See United States v. Hernandez–Escobar*, No. 2:02CR–00084(02), 2002 WL 31761144 (N.D.Tex. Dec.6, 2002) (unpublished opinion). Moreover, numerous Fifth Circuit cases that address whether a defendant's compulsory process or due process rights were violated outside the context of the alien deportation cases do not require the defendant to prove bad faith. *See Janecka v. Cockrell*, 301 F.3d 316, 326–27 (5th Cir.2002), *cert. denied*, 537 U.S. 1196, 123 S.Ct. 1264, 154 L.Ed.2d 1034 (2003); *Roussell v. Jeane*, 842 F.2d 1512, 1516 (5th Cir.1988); *Campbell v. Klevenhagen*, 760 F.Supp. 1206, 1214 (S.D.Texas 1991); *Dyson v. Cockrell*, No. Civ.A.402CV449A, 2002 WL 32494528, *3–4 (N.D.Tex.2002) (unpublished opinion).

■ Without a clear mandate from the Fifth Circuit Court of Appeals dictating that proof of bad faith on the part of the Government is a requisite when establishing a violation of a defendant's compulsory process or due process rights, and without the Court of Appeals defining the precise contours of "bad faith," this court holds it sufficient to say that, based on the specific facts in the present case, the defendant has shown that the Government did not act in good faith when it deported Villela.

This court's conclusion finds support in *United States v. Avila–Dominguez*, 610 F.2d 1266 (5th Cir.), *cert. denied*, 449 U.S. 887, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980). In *Avila*, the defendants were convicted of encouraging the entry of twenty-two illegal aliens into the United States and transporting those aliens within the country. *Id.* at 1268. The defendants were arrested and taken into custody on April 22, 1978. *Id.* The illegal aliens were taken into the custody of and interviewed by the Immigration and Naturalization Service, and

the United States Attorney concluded that eight of the aliens would be detained as material witnesses. *Id.* On April 24, Complaints against the defendants were issued, notifying them of the crimes with which they were charged, and initial appearances were made on April 24th, at which time the defendants had an attorney. *Id.* The sole woman alien in custody and the two children accompanying her were granted voluntary return to Mexico, and the other eleven aliens were deported to Mexico on May 2. *Id.*

The issue in *Avila* was whether the defendant's conviction should be reversed because the Government deported potential witnesses before the defendant's counsel could interview them. *Id.* at 1267. The Court confirmed the convictions on two grounds: "partly because the case ha[d] an element of waiver of those rights, but more importantly because no suggestion ha[d] been made to th[e] Court or the district court as to how the witnesses might have, in the slightest way, helped defendants in the defense of th[e] case." *Id.* Though defense counsel maintained that he had asked about the aliens' names and location on or about April 24, he failed to demonstrate that he took any action to follow up that query. *Id.* at 1269. The Court reasoned that "[a] requirement that defendants act diligently to preserve testimony of illegal aliens must be imposed in the circumstances of these cases." *Id.* The Court further noted that the

> "[d]efendants could have preserved the testimony of the eleven deported aliens by making a prompt formal request for their names and whereabouts. If there had been insufficient time to interview all the witnesses, a postponement of their deportation could have been sought. Any alien believed by defendants to be able to give exculpatory

testimony could have been detained in this country until trial."

*Id.*

While the Court in *Avila* observed in passing that the Government did not act in bad faith or purposefully divest the defendants of their rights, the Court did state that "[n]ow that the Government knows we subscribe to the rule that defendants have a constitutional right to interview such witnesses, *and must be given reasonable notice before their deportation,* this decision will not necessarily immunize subsequent similar conduct." *Id.* at 1270 (emphasis added). *Avila* thus teaches that, at the very least, in some circumstances the Government must give defense counsel reasonable notice before it unilaterally deports a potential alien witness.

The present fact situation qualifies as one of those circumstances. Agent Jones interviewed Villela at the Fort Brown Border Patrol Station in Brownsville, Texas, on or about June 2, 2004, *See* Defendant's Motion at Exhibit B, and the following excerpt is contained in Agent Jones' typed report of same:

> ...she noticed an immigration official, and ... the other aliens began to scatter. Villela ran only a short distance with her uncle because she was pregnant. When Villela saw the official, she and her uncle ran toward a fence and tripped over a wire. An official yelled at Villela and her uncle, "stop you bastards", [sic] and used some other vulgar language. Villela advised that she did not like being called names, so she yelled back at the official, and called him a "pendejo" (vulgar Spanish word). The official pushed Villela, took out his baton, and told her to sit down or he was going to hit her. Villela recalls her uncle exchanging some vulgar words with the official, then the official grabbed her uncle and threw him to the ground. Vil-

lela advised that she did not see her uncle and the official fighting on the ground because it occurred in the sorghum field. Villela noticed that a second official arrived on the scene, so she ran to him to get help for her uncle who was getting hit. Once Villela approached the second official, he (the second official) grabbed her, placed her on the ground face down, and put his foot on her back. Villela began to cry and told the official that she was pregnant. Villela advised that she never hit the official or fought back except for her vulgar verbal remarks to the officer. Villela advised that she saw a scratch mark on the officers nose [sic] once the struggle was over.

*Id.*

Agent Jones' also interviewed Defendant on or about June 2, 2004, and Agent Jones' "working copy" of the interview, from which he would eventually create his report, reveals that Defendant contends that he was going to the defense of his niece when Agent Robles struck him first:

Hernandez advised that all of the other aliens immediately began to scatter. Hernandez and his niece ran approximately 20 meters to a fence, saw an official get out of his vehicle, and stopped running. Hernandez advised that his niece was pregnant and did not want to run or climb over the fence. Hernandez saw that the official had a radio in one hand, and something else in the other. Hernandez advised that his niece asked the official why they were being stopped. The official said that they were under arrest. Hernandez's niece told the official that he was a racist. The official told Hernandez's niece to "callate el hocico", [sic] (an insulting way of saying shut your mouth), and sit down. Hernandez's niece became very angry with the official, and told him that she was not going to sit down, nor was she going to shut her mouth. Hernandez advised that the official then took out his baton, raised it into the air, and told his niece that if she did not shut her mouth and sit down, he (the official) was going to hit her (the niece). Hernandez advised that he got between the niece and the official and told the official not to hit her. The official then grabbed Hernandez by the shirt and put him on the ground. Hernandez got up from the ground, and told the official not to hit his niece because she was pregnant. The official then used his baton and hit Hernandez in the leg, the side of the back and the forearm. Hernandez advised that he was struggling with the official so that he would not get hit again, or possibly killed. Hernandez remembers that his niece was screaming while this was happening, but never saw her hit the official. Hernandez said that he and the official were on the ground in a sorghum field, so that he (Hernandez) could not see his niece. Hernandez advised that while on the ground, he was swinging his arms around so that he would not get hit by the baton again, and that he knows that his hand scratched the officials nose [sic], but he (Hernandez) never intentionally hit the official with his fist or any other weapon. Hernandez remembers a radio microphone flipping around during the struggle. Hernandez advised that the radio microphone might have hit the official during the struggle, but Hernandez never swung the radio to intentionally hit the official.

Agent Jones' Stmts of Witnesses' Stmts.

Agent Jones' two reports demonstrate that Defendant informed the Government that Agent Robles struck him first and that he fought back in self-defense or, to

some extent, in defense of Villela.[7] The reports also show that Villela was an eyewitness to the altercation between Agent Robles and Defendant and that she corroborated Defendant's contention that Agent Robles hit Defendant first. The Government therefore was fully aware that Villela possessed, at the very least, possible exculpatory evidence. Nevertheless, in spite of this knowledge, without notifying Defendant's counsel, the Government filed a superceding criminal information charging Villela with a misdemeanor to which she pled guilty. Villela received time served and then was promptly remanded to the custody of the federal marshals to begin the deportation process.[8]

Under these facts, where there is no doubt that the Government knows for certain that Villela's testimony could have conceivably benefited Defendant, the Government was obligated to notify defense counsel of Villela's upcoming plea and deportation to afford defense counsel an opportunity to interview Villela prior to her removal from the United States. The Government acted in a manner that interfered with Defendant's ability to offer exculpatory evidence by Villela, and it simply cannot claim it had no duty to give proper notice to defense counsel when it was effectively putting Villela beyond the reach of the subpoena power of the Southern District. Consequently, the Government's lack of notice to defense counsel clearly violated Defendant's compulsory process and due process rights.

The Government argues that Defendant must show reasonable diligence in attempting to obtain the requested information without the government's assistance. Specifically, the Government maintains that, although Villela was released on July 15, 2004, defense counsel never attempted to contact Villela until after the final pretrial conference held on August 31st. In support of its argument, the Government notes that Defendant's counsel requested a continuance on August 10th and filed a motion to dismiss the indictment on August 25th, all before attempting to contact Villela. The Government contends that it could not hold Villela—pregnant and in custody for over one month before pleading guilty to a lesser offense—in custody longer than her sentence simply because Defendant decided several weeks later that he wanted her to testify.

The Government's argument misses the point. First, this Court notes that the Government never contends that Defendant's counsel was not reasonably diligent in attempting to interview Villela because he may have made no such attempt between May 28, 2004, the day she was arrested, and July 15, 2004, the day she pled guilty and was taken into the federal marshal's custody for deportation. This court believes that this time interval—between May 28th and July 15th—is relevant to this case, not the period after July 15th, the period upon which the Government focuses. After July 15th, defense counsel could not have interviewed Villela because she was already removed from this country.

Moreover, the record is silent as to when defense counsel actually attempted

---

**7.** Defendant argues in his brief that Villela's testimony reveals that Defendant was acting in defense of her.

**8.** As stated earlier, neither the Government nor Defendant supplied this court with the exact date of Villela's removal from the United States. Under normal procedure—and this court has no reason to doubt that Villela's deportation did not conform to the approach typically employed—Villela would have been deported within twenty-four hours of being remanded to the custody of the federal marshals.

to make contact with Villela. As he believed that she was still in custody up until July 29, 2004, it can be assumed that he would not have done so before then. Of import is the fact that the Government never provided to Defendant's counsel a copy of its motion to dismiss the indictment, which it filed on July 16th, despite the mandate in the Southern District's local criminal rule 12.4 that "[a]ll motions must be served on all parties and contain a certificate of service." CrLR 12.4. The Government's failure to copy Defendant's counsel further bolsters his contention that he did not learn of Villela's deportation until the July 29th hearing.

Further, the record does contain defense counsel's sworn affidavit wherein he averred that Defendant provided him with the names of Defendant's sisters and mother, located in Ciudad Victoria, Mexico. Defendant's Motion at Exhibit D. At Defendant's request, he attempted to make contact with Villela, but was unable to do so. *Id.* Defendant's counsel also declared that he contacted Maria Estella Izaguirre ("Izaguirre"), the attorney who represented Villela. *Id.* Defendant's counsel avowed that Izaguirre informed him that she was unable to contact or locate Villela, and the telephone numbers she was given to contact Villela's mother were no longer valid. *Id.*

 As for the Government's contention that it could not hold Villela, *Valenzuela* clearly states that, where the Government, acting in good faith, makes a reasonable judgment that an alien could not assist a criminal defendant, it may be permissible to deport the alien without notifying defense counsel prior to the deportation. *Valenzuela*, 458 U.S. at 872, 102 S.Ct. 3440. Here, the Government never even

argues to this court that it made *any* judgment as to whether Villela's testimony could aid Defendant prior to her deportation. At best, the Government can only argue it made no judgment because it is clear that anyone making such a judgment would have to conclude that Villela's testimony would help Defendant. Considering Agent Jones' report that recapitulates Villela's interview in which she admitted to witnessing the altercation between Agent Robles and Defendant and in which she stated that Agent Robles struck the first blow, the Government would be hard pressed to convince this court that it decided that Villela's testimony would not have benefited Defendant. Faced with the Government's lack of any judgment as to Villela's testimony, under *Valenzuela*, this court cannot hold that it was permissible for the Government to deport Villela without first giving defense counsel notice of same.

This court does not suggest that the Government retain indefinitely every illegal alien who may have some remote connection with alleged criminal activity, especially one who is pregnant.[9] It is, however, the view of this court that where, as in the instant case, the Government unequivocally knew that Villela had potentially useful evidence to the defense and it unilaterally placed her beyond the reach of a subpoena to guarantee her testimony, the Government should have made defense counsel aware that Villela would no longer be in custody and was being deported.

Though the Government never advanced to this court the argument that defense counsel had a reasonable opportunity to interview Villela when she was in custody

9. The record is silent with respect to Villela's actual due date; however, trial was to begin less than one month after she was deported.

between May 28th and July 15th, this court has considered such an argument and has summarily rejected it in light of the realities of pretrial procedure. Defendant and Villela were charged in the same indictment with the same offense, and Defendant had no reason to believe that Villela would not remain in custody and eventually go to trial. Defendant's counsel acted properly in light of the actuality of trial preparation. He filed his pretrial discovery motions before the July 9, 2004 deadline. The Government never responded to any of these motions, though its responses were due by July 23rd and, most importantly, it did not copy Defendant's counsel on its motion to dismiss the indictment against Villela, which would have served as notice to counsel that at least something was in the wind. A hearing on these motions was scheduled for July 29th, and it was not until that hearing that defense counsel learned that Villela was no longer in the United States. Defense counsel cannot be expected to speculate that the Government might charge Villela with a lesser crime and that Villela might agree to plead guilty, receive time served, and be deported. To do so would create an undue burden on defense counsel's trial preparation.

In summary, this court finds that the Government did not act in good faith when it deported Villela. Viewed from the position most favorable to the Government, the Government never made any judgment as to whether Villela's testimony could aid Defendant, as required under *Valenzuela*. Moreover, it was clear that the Government knew Villela possessed possible exculpatory evidence. In light of these facts, the Government should have given defense counsel notice of Villela's pending deportation. While not holding that bad faith on behalf of the Government is a necessary element—given that the Fifth Circuit has not, to date, so held—this court does find that the Government's failure to make Villela available or to notify Defendant of her impending departure to be in bad faith, given her possession of exculpatory evidence and its knowledge of this evidence.

## C. Villela's Testimony was Noncumulative, Material and Favorable to Defendant

■■■ Under *Valenzuela*, to establish a violation of his compulsory process and due process rights, Defendant must show by definite and nonspeculative evidence that Villela's noncumulative testimony would have been material and favorable to his defense, and, thus, its loss has meaningfully impaired his ability to defend himself. *Valenzuela*, 458 U.S. at 873, 102 S.Ct. 3440. Defendant has presented sufficient evidence upon which this court determines that Villela's testimony meets these three criteria, to wit, that her testimony would have been material, favorable, and noncumulative.

Agent Robles was telephonically interviewed on or about June 4, 2004, by Agent Jones, whose "working copy" of the interview, from which he would eventually create his report, declares as follows:

Robles advised that he headed toward two aliens [Defendant and Villela] who were attempting to flee, and told them to sit down. Robles advised that both aliens were immediately confrontational. The female approached Robles, got up into Robles' face, told Robles to quit yelling, and stated that she was not going to sit down. The female also told Robles that she wanted (Robles) to hit her. Robles advised that he backed away from the female, and called in for assistance.

Robles advised that he called in for assistance. Upon calling in for assistance on his radio, the female began to run away. Robles placed the microphone

portion of his radio in his back pocket, and started to run after the female. Once Robles caught up with the female, he grabbed her arm. Robles advised that the male alien [Defendant] approached him from behind, pushed him, and grabbed his (Robles') radio. The male then swung the radio, hitting Robles in his nose.

Robles advised that he took his baton out and hit the male alien in the leg near the knee area, and that he also swung the baton at the male alien a few more times, but was not very affective [sic] because he and the alien were in a field of sorghum. Robles advised that the male alien was on the ground while he (Robles) was trying to subdue the male alien, the female alien approached him from behind, and began to hit him (Robles) on the head with her purse.

Robles advised that after being hit several times with the female alien's purse, his partner Charles Gantt arrived on the scene. The female alien quit hitting Robles, and ran toward Gantt. Robles remembered that the female alien was yelling something when she ran toward Gantt, but could not recall what she was yelling. Robles advised that at this point he was still struggling with the male alien on the ground, and that the male alien was trying to take his baton. Robles advised that he was getting a little bit dizzy and tired due to the lose [sic] of blood from his nose, and the physical struggle, so he told the male alien that he (Robles) was going to shoot him (the male alien) if he didn't begin to comply. The male alien began to comply.

Agent Jones' Stmts of Witnesses' Stmts.

Agent Jones also telephonically interviewed Agent Gantt on or about June 3, 2004, and Agent Jones' "working copy" of the interview, from which he would eventually create his report, declared that Gantt provided the following information:

Gantt advised that while he was in pursuit of the aliens, he was approximately 150 yards away from Robles, with a field of sorghum between him and Robles. Gantt advised that he could see Robles from that distance. Gantt saw Robles with two aliens [Defendant and Villela], and believed that Robles had the aliens under control. Gantt advised that he thought that Robles was escorting the aliens back to his (Robles') vehicle, when the female alien broke loose and tried to run away. Robles pursued the alien and apprehended her, wherein Gantt saw the female alien hit Robles with her purse. Gantt then saw the male alien run up behind Robles, jump on him, and hit him. Gantt advised that after that he knows that Robles began to struggle with the male alien, but that he had to leave his line of sight of Robles to get around the sorghum field to help Robles subdue the aliens. Gantt did not see the male alien hit Robles with Robles own radio.

Once Gantt made his way toward the fleeing aliens, he came upon the female alien that had resisted arrest and ran from Robles. Gantt advised that the female alien was trying to run and get away, but she inadvertently ran directly into his (Gantt's) path. Gantt advised that when the female alien noticed Gantt, she became very upset, so Gantt grabbed her, and applied pressure on her collarbone, forcing her to sit down. Gantt advised that the alien remained seated, and that she was never placed on her back or her stomach. Gantt advised that once Robles subdued the male alien he (Robles) brought him (the male alien) toward him (Gantt). Gantt noticed that Robles nose [sic] was bleeding. Robles

told Gantt that the male alien had hit him with his (Robles) radio.

*Id.*

No one involved in this case disputes that the physical conflict between Agent Robles and Defendant occurred. Rather, at issue is who instigated the fight between the two men. If Defendant struck Agent Robles first, as Agent Robles and Agent Gantt claimed, Defendant is guilty of assaulting a federal agent. However, if Agent Robles struck Defendant first, as Defendant and Villela maintained, Defendant might have been entitled at trial to a jury instruction on self-defense or defense of another, i.e., Villela. Generally, a defendant is "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988).

Consequently, Villela's presence on the stand does not provide the possibility of some vague benefit to Defendant. Quite the contrary, Villela is an eyewitness whose testimony would have directly contradicted that of Agent Robles and Agent Gantt. Her testimony would therefore have been relevant to a theory of self-defense or defense of another and would have undermined the agents' credibility. Accordingly, Villela's testimony would have been material and favorable to Defendant's defense.

Further, Villela's testimony would have had a reasonable likelihood of affecting the judgment of the trier of fact. If believed by a jury, Villela's testimony might have convinced a jury to acquit Defendant. Obviously, her testimony would not have been conclusive, for the jury might have disbe-

lieved Villela. However, in view of the presumption of innocence and the Government's burden of proving Defendant guilty beyond a reasonable doubt, this court cannot say that Villela's anticipated testimony would not have tended to create doubt about the altercation.

Finally, the testimony of Villela would not have been cumulative. A hypothetical illustrates this point. Assume this case went to trial and Agent Robles and Agent Gantt were available to testify. The Government would call these agents, its only eyewitnesses to the contact between Agent Robles and Defendant.[10] The defense would be left with just Defendant, who has a constitutional right not to testify. However, Defendant would have no choice but to testify, waiving his right not to do so, in order to rebut Agent Roble's and Agent Gantt's testimony. Alternatively, even if Defendant wanted to testify to his side of the story, he would have no other witnesses to back him up, while the Government would have at least both agents, if not more witnesses. Under this scenario, there is no doubt that Villela's testimony is not cumulative and, in fact, vital to Defendant's defense.

Further, as Villela had already pled guilty, it is also unlikely that she would have invoked her Fifth Amendment right to remain silent had she been present at Defendant's trial. *See Roussell*, 842 F.2d at 1516 (noting that a defendant's right to call a witness does not trump a witness' Fifth Amendment privilege against self-incrimination). Moreover, Agent Jones could not testify to what Villela told him, as such testimony would be inadmissible hearsay. *See* Fed.R.Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the

---

10. Counsel for the Government has already indicated to the court her intention to call these gentlemen as witnesses.

trial or hearing, offered in evidence to prove the truth of the matter asserted.").

Accordingly, Defendant has made more than a "plausible showing" that the "testimony [of Villela] would have been both material and favorable to [the] defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela,* 458 U.S. at 873, 102 S.Ct. 3440. Defendant is therefore entitled to the relief he seeks.

## III. CONCLUSION

Based on the foregoing discussion, the court grants Defendant's motion to dismiss the indictment. Docket numbers 43 (motion to dismiss) and 53 (amended motion to dismiss) are hereby granted. This Order should not be construed as a dismissal with prejudice as to any other charge that might be brought against Defendant, such as illegal reentry. This Order solely pertains to the actual indictment relating to the altercation with Agent Robles.